[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DEC 22, 2010
JOHN LEY
CLERK

No. 08-16696
_____

D. C. Docket No. 07-80176-CR-KLR

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALICIA D. RODRIGUEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 22, 2010)

Before CARNES, FAY and SILER,* Circuit Judges.

_____

*Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

CARNES, Circuit Judge:

This case poses the question of whether there is a vindictive judge or cowardly counsel exception to the contemporaneous objection rule. Unless there is such an exception, the only issue that the appellant is pressing on appeal is barred for failure to object because she cannot meet the requirements of the plain error rule. Disagreeing with the Second Circuit, we hold that the possibility a judge may be unhappy with an objection does not excuse the failure to make it.

I.

Alicia Rodriguez participated in a vast scheme that fraudulently bilked the federal government out of more than $3,000,000 in Medicare funds. Facing a ten-count indictment, she entered into a written plea agreement. After pleading guilty she was sentenced consistently with that agreement, but she contends that a comment by the sentencing judge created the appearance that her sentence was based at least in part on her national origin, which is a factor that is irrelevant to sentencing. See United States Sentencing Guidelines § 5H1.10 (Nov. 2007). Rodriguez concedes that the judge was not actually biased in sentencing her but contends that his comments created the "appearance of bias." According to Rodriguez, that entitles her to be resentenced.

At the sentence hearing Rodriguez did not object to the judge's comment

2

about her national origin, or to anything else for that matter. Had she objected to the comment, the judge could have corrected on the spot any appearance of bias his comments may have created. Instead, Rodriguez is now asking this Court to vacate her sentence and remand the case for resentencing so that the district court can correct—some two years later—any appearance that it considered her national origin when determining the sentence to impose.

II.

Rodriguez is a Cuban refugee and permanent legal resident of this country. Beginning in mid-2005 she and a cohort, Juan Viera, set in motion a scheme to submit fraudulent claims for durable medical equipment—wheelchairs, catheters, hospital beds, and the like—to the Medicare Program. As part of the scheme they purchased existing medical equipment companies that had valid Medicare provider numbers, and they recruited other people to pose as the owners in order to conceal their own ownership.

Rodriguez and Viera then began billing Medicare for bogus claims. In preparing the claims, they obtained physician and patient identification numbers, either by purchasing them from others engaged in Medicare fraud or by recycling numbers that had already been used. Over a nine-month period, they submitted to Medicare over $19,000,000 in fraudulent claims and received over $3,200,000 in

payments.  Not one piece of medical equipment was ever actually ordered by a physician or provided to a beneficiary.  It was all fraud, perfectly pure and somewhat simple.

After Medicare had made a deposit into one of the company accounts, Rodriguez and Viera used various money laundering mechanisms to get cash out of those accounts.  One way they did it was through eight different "check cashers" who would take checks Rodriguez had written on company accounts, cash them, and then return the cash to her and Viera for a fee.  In other instances the two of them relied on the straw "owners" to withdraw the funds directly in the form of cash or cashier's checks.

The scheme began to unravel in mid-2006 when one of the straw owners began cooperating with the government and agreed to secretly record a meeting with Rodriguez.  At that meeting the informant showed Rodriguez a subpoena she had received to appear before a grand jury investigating the fraudulent scheme. Rodriguez encouraged her to lie to the grand jury and say nothing to law enforcement.  Rodriguez also gave the informant an envelope containing $4,600 in cash and suggested that she leave town.

## III.

The grand jury returned an indictment against Rodriguez and Viera in November 2007, charging Rodriguez with five counts of mail fraud, four counts of money laundering, and one count of obstructing a criminal investigation. In February 2008 she entered into a written plea agreement with the government, agreeing to plead guilty to one count each of mail fraud, money laundering, and obstruction of a criminal investigation. See 18 U.S.C. §§ 1341, 1956(a)(1)(A) and 1518. In return the government agreed to dismiss the remaining counts and to recommend, based on Rodriguez's timely acceptance of responsibility, that the court reduce by two the offense level that would otherwise be applicable to her. See U.S.S.G. § 3E1.1. The government also promised that if that offense level was determined to be 16 or higher, it would recommend that Rodriguez be given a three-level reduction under § 3E1.1(b). Finally, the government committed to decide before the sentence hearing whether Rodriguez had cooperated enough to warrant its filing a § 5K1.1 motion for a downward departure.

The presentence report calculated Rodriguez's offense level at 37, which was reduced three levels under U.S.S.G. § 3E1.1 to reach a final offense level of 34. That level, combined with her criminal history category of I, resulted in an advisory guidelines range of 151 to 188 months imprisonment. Before the

sentence hearing the government filed a motion under U.S.S.G. § 5K1.1, requesting a reduction in Rodriguez's sentence below 151 months and reserving the right to make a more specific recommendation at the sentence hearing.

At that hearing the parties did not disagree about the calculations in the PSR or the advisory guidelines range. The hearing focused instead on the extent of Rodriguez's cooperation and how much of a reduction from the guidelines range she deserved for it. The government recommended a 40 percent reduction, which would have produced a 91-month sentence. Rodriguez asked instead for a sentence of 60 months, arguing that her cooperation was "above and beyond what is typical." She pointed out that she had given key testimony during a two-day trial of defendants charged in another healthcare scam; had agreed to testify against her co-defendant Viera; had provided information implicating an accountant and her own half-sister in the fraud; and had eventually helped authorities identify assets purchased with the fraudulently obtained funds.

In response, the government acknowledged that Rodriguez had provided extensive cooperation, but it pointed out that her help in identifying assets came only after she had engaged in "some really fairly brazen activity"—attempting to shield assets from recovery by transferring them to her children. The government pointed out:

6

[Y]ou also have to take into account this was a fairly extensive fraud that involved her and the codefendant were operating, were supposedly operating—they basically incorporated shell companies . . . that over a fairly short period of time billed $19 million to the Medicare program. So I don't want the Court to lose sight of the seriousness of the offense when you impose sentence, and I think she should be recognized for her assistance which was significant, but I also think when imposing a sentence you have to take into account the seriousness of the offense.

Having heard from the attorneys, the court proceeded to impose Rodriguez's sentence, beginning its discussion with the comment that forms the basis of this appeal:

All right. This is really a disturbing case. She comes to this country as a Cuban refugee seeking freedom from the [C]ommunist rule and the first thing she does is she rips off the Government for $19 million on a program that's designed to help people who have physical disabilities, and to me that's shocking. That's shocking.

There was no objection to that comment. The court went on to note that Rodriguez's extensive cooperation with the government reflected how deeply involved she was in the fraud: "She had a lot to offer because she had a lot of knowledge of culpable activity." The court stated that it usually gave a sentence reduction of one-third for substantial assistance and called the government's recommendation of a 40% reduction "generous," but it accepted that recommendation and imposed a sentence of 91 months, which was 60 months below the bottom of Rodriguez's recommended guidelines range of 151 to 188

7

months.

The court then outlined other terms of Rodriguez's sentence, such as restitution and supervised release. It concluded by asking:

> Now that sentence has been imposed, does the defendant or her counsel object to the Court's findings of fact or the manner in which the sentence was pronounced?

Rodriguez's counsel responded, "No, sir." After the government moved to dismiss the other counts, the court inquired whether either side had "[a]nything further?" Rodriguez's counsel again responded: "No, sir."

IV.

Because Rodriguez's counsel did not object to the court's comments at the sentence hearing, we ordinarily would review them only for plain error. United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005) (explaining that because the defendant did not preserve the sentence issue by objecting in the district court, review was only for plain error); United States v. Humphrey, 164 F.3d 585, 587 (11th Cir. 1999) ("The appropriate standard of review, given [the defendant]'s failure to object in the district court to the consecutive sentences, is plain error.") (citing Fed. R. Crim. P. 52(b)); see also United States v. Olano, 507 U.S. 725, 731, 113 S.Ct. 1770, 1776 (1993) (discussing plain error as an exception to the well-established rule that "a constitutional right, or a right of any other sort, may be

8

forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it" (quotation marks omitted)).

Rodriguez urges us to craft an exception to the contemporaneous objection rule for objections suggesting that the district judge was either biased or had created the appearance of bias. She relies on the rationale of two cases from the Second Circuit, United States v. Leung, 40 F.3d 577 (2d Cir. 1994), and United States v. Kaba, 480 F.3d 152 (2d Cir. 2007).

In Leung the Second Circuit vacated and remanded after the sentencing judge made two remarks that referred to the defendant's ethnic origin and alien status. 40 F.3d at 585–87. The first remark came as the judge explained his rationale for rejecting the defendant's request for a downward departure based on Leung's difficult childhood in China. The judge stated:

> Indeed frequently when I sentence folks who are not American citizens—she is a Canadian citizen who comes from mainland China—frequently when I sentence non-American citizens I make the observation which may to seem [sic] cynical but it is not intended to be cynical, it is intended to be factual: We have enough home-grown criminals in the United States without importing them. And I don't see this as a case if [sic] for downward departure in any manner, shape or form. And I decline to downwardly depart.

Id. at 585. The judge's second comment came after the sentence had been imposed, as he was explaining the reasons why he had set it at the point he did in

9

the guidelines range:

> The purpose of my sentence here is to punish the defendant and to generally deter others, particularly others in the Asiatic community because this case received a certain amount of publicity in the Asiatic community, and I want the word to go out from this courtroom that we don't permit dealing in heroin and it is against president [sic] law, it is against the customs of the United States, and if people want to come to the United States they had better abide by our laws. That's the reason for the sentence, punishment and general deterrence.

Id.

The government argued that because Leung had not objected to the remarks, she had forfeited her right to challenge them on appeal. The Second Circuit disagreed, explaining that "[t]he first remark was somewhat ambiguous, and a defendant is understandably reluctant to suggest to a judge that an ambiguous remark reveals bias just as the judge is about to select a sentence." Id. at 586. As for the second remark, the court pointed out that it occurred after sentencing and concluded:

> This situation is not comparable to one where a defendant fails to object to factual statements in a presentencing report, or fails to object to a proposed legal ruling regarding an application of the Sentencing Guidelines. In a variety of circumstances in which a party could not reasonably have been expected to raise a contemporaneous objection at a sentencing hearing, we have allowed the objection to be raised for the first time on appeal.

Id. (citations omitted). The Second Circuit also stated that its "slightly greater willingness, when there are extenuating circumstances" to hear objections that

10

were not made in district court was in part a reflection of the fact that remanding a case for resentencing did not strain judicial resources. Id. at 586 n.2. The court observed that "[u]nlike trial errors, whose correction requires a new trial that a timely objection might have obviated, correcting sentencing errors usually demands only a brief resentencing procedure." Id.

Kaba involved a native of the West African nation of Guinea who had entered the United States illegally in 2001 and was convicted of a heroin charge in 2005. 480 F.3d at 153. Before the sentence hearing, Kaba's counsel submitted to the district court a letter "urging the district court to show 'mercy and leniency,' because of the extreme conditions of [Kaba's] childhood and young adulthood in Guinea." Id. at 154 (citation omitted). At the hearing itself counsel again "pleaded for leniency" based on Kaba's difficult background. Id. at 155. In response, the Assistant United States Attorney pointed out "that the government's 'biggest concern[]' was 'the message that [the sentence] sends to other people in this community,'" noted that the government had spent considerable resources investigating the tightly-knit community involved in the West African heroin trade, and argued that Kaba's sentence might serve as a deterrent to others who were considering becoming involved in that trade. Id. at 155 (alterations in original).

While imposing the sentence, the district court observed that it assumed

11

from the government's comments that Kaba's punishment would have a deterrent effect, "'that people from the Guinea community are going to say gee, do you hear what happened to [Kaba]? I don't want that to happen to me.'" Id. at 155–56 (alteration in original). The district court added that it hoped the sentence "'has some effect here that will deter other people from that background from doing what you've done here.'" Id. at 156. Like Rodriguez, Kaba did not object at the sentence hearing to the district court's comments. Id. at 158. On appeal she contended that the district court had improperly considered, "or at least improperly appeared to consider," her Guinean national origin in determining her sentence. Id. at 156.

The Second Circuit, relying on its precedent in Leung, found that although the record did not reveal any actual bias by the sentencing judge, "[t]he creation of at least the appearance of unfairness requires a remand for re-sentencing." Id. at 158. The court said this about the failure of Kaba's counsel to object:

> Unlike cases where a defendant fails to object to factual statements in a pre-sentence report or a legal ruling regarding the application of the Sentencing Guidelines, in Leung the district court's two questionable remarks either occurred after sentencing or were ambiguous. In part because "a defendant is understandably reluctant to suggest to a judge that an ambiguous remark reveals bias just as the judge is about to select a sentence," we concluded that the defendant did not waive her argument on appeal. The same principles control here.

Id. (quoting Leung, 40 F.3d at 586) (citations omitted). According to Rodriguez,

those principles also control in this case and excuse her failure to object, thereby relieving her of the burden of showing plain error. We disagree for three reasons.

The first is that under settled law if a party does not move to recuse a judge on actual bias grounds, review is only for plain error. See United States v. Berger, 375 F.3d 1223, 1227 (11th Cir. 2004) ("Ordinarily, we review a judge's decision not to recuse him or herself for an abuse of discretion. However, because [the defendant] failed to seek recusal of the district judge in the proceedings below, we review his recusal request for plain error." (citation omitted)); Hamm v. Members of Bd. of Regents of State of Fla., 708 F.2d 647, 651 (11th Cir. 1983) ("The plaintiff in this case invoked neither statute [governing recusal of a judge] in the district court so that the plain error standard of review applies here."). That is the law, even in the Second Circuit. See United States v. Carlton, 534 F.3d 97, 100 (2d Cir. 2008) ("We review a district court's decision to deny a recusal motion for abuse of discretion. When such a motion was not made below or a new ground for recusal is raised on appeal, we review a district court's failure to recuse itself for plain error." (citation omitted)). A judge's ire is, if anything, more likely to be raised by an assertion that he is actually biased than by an assertion that he only appears to be biased. Holding that the law does not require objections to statements appearing to indicate bias where there is none would be inconsistent

13

with the law requiring objections where there is bias. And inconsistency is inconsistent with the rule of law.

The second reason that we reject Rodriguez's position, and the Second Circuit's decisions on which it is based, is that they substantially undermine the important interests served by the contemporaneous objection rule. As we have explained, "The narrowness of the plain error rule is a reflection of the importance, indeed necessity, of the contemporaneous objection rule to which it is an exception." United States v. Pielago, 135 F.3d 703, 709 (11th Cir. 1998). Requiring an objection at trial "fosters finality of judgment and deters 'sandbagging,' saving an issue for appeal in hopes of having another shot at trial if the first one misses." Id. Not only that, but:

> The contemporaneous objection rule also promotes the salutary interest of making the trial the main event. Failure to enforce it "tends to detract from the perception of the trial of a criminal case . . . as a decisive and portentous event." Wainwright v. Sykes, 433 U.S. 72, 90, 97 S.Ct. 2497, 2508 (1977). Moreover, requiring timely objections allows trial courts to develop a full record on the issue, consider the matter, and correct any error before substantial judicial resources are wasted on appeal and then in an unnecessary retrial. See United States v. Sorondo, 845 F.2d 945, 948–49 (11th Cir. 1988). A full record and a prior decision in the district court are essential ingredients to our substantive review of issues—they flesh out an issue in a way the parties' briefs may not.

Id. (omission in original); see also id. ("[T]he contemporaneous objection rule is essential to the integrity and efficiency of our judicial process. . . ."). The vital

14

interests protected by the rule requiring an objection are discarded under the exception the Second Circuit has created that excuses the failure to object whenever a lawyer would be "understandably reluctant" to do so. See Kaba, 480 F.3d at 158; Leung, 40 F.3d at 586. And what lawyer will not be "understandably reluctant" to object if no objection is required? By not objecting the lawyer can avoid any risk that an ambiguous statement will be clarified or an actual error corrected on the spot in response to an objection; she can keep the issue in her pocket in hopes that it will serve as a get-out-of-judgment-free card on appeal.

The third reason we reject Rodriguez's position is that it is demeaning to both judges and attorneys. Judges know that it is the role and duty of attorneys to represent their clients zealously and object to what they perceive to be errors or potential errors. Many objections have as their premise that the judge has violated, or but for the attorney's intervention would violate, some law, rule of procedure, or right of the attorney's client. That is the stuff of which objections are made. To suggest that judges, whose solemn duty it is to apply the law fairly and impartially to all parties before them, would vindictively respond to an attorney's objection by punishing the client is demeaning to the judiciary. And to suggest that lawyers, who perceive a valid basis for objection, would cower in their seats, fearing

15

retribution from the bench if they do object, is demeaning to the bar.[1]  We reject

any vindictive judge or cowardly counsel exception to the contemporaneous

objection rule.[2]

V.

Because there was no objection in the district court, our review of the

asserted error in the judge's comments about Rodriguez's having come from Cuba

to this country is only for plain error.  Under this standard Rodriguez must show

that: "(1) an error occurred; (2) the error was plain; (3) it affected [her] substantial

rights; and (4) it seriously affected the fairness of the judicial proceedings."

United States v. Gresham, 325 F.3d 1262, 1265 (11th Cir. 2003).  Only if all four

of those showings are made does a court of appeals have any authority to correct

an error that was not preserved by a timely objection in the district court.  United

States v. Olano, 507 U.S. 725, 732, 741, 113 S.Ct. 1170, 1776–77, 1781 (1993).

---

[1]While our decision in no way turns on this point, we note that there is no indication Rodriguez's trial counsel (who is not the attorney representing her in this appeal) believed that there was error in the judge's statements at sentencing but failed to object out of fear of retribution.

[2]At the risk of piling on, we see another flaw in the position being urged on us.  Neither Rodriguez nor the Second Circuit has ever explained why counsel would be afraid to raise an objection at trial but not afraid to raise it on appeal.  There is no way that a judgment can be reversed and the case remanded for further proceedings without the judge who entered it finding out.  And it stands to reason that a judge would be at least as miffed at one of his judgments being reversed on a ground he could have corrected if it had been pointed out to him at the time, as he would have been if the ground had been raised by an objection made in time for him to have taken corrective action. The "understandably reluctant" exception to the contemporaneous objection rule is not grounded in logic.

Rodriguez has not convinced us that she has met the plain error requirements.

First, we doubt whether there was error at all. The asserted "error" is not that the sentencing judge imposed a longer sentence because Rodriguez was not from this country. She does not contend that the judge did that, and instead concedes there is no reason to believe that he did. What Rodriguez contends is that a reasonable observer might have inferred that the judge considered her national origin in sentencing her, even though it actually had no effect, and that appearance by itself is enough to require resentencing.

We are not convinced of either of Rodriguez's premises. It seems to us unlikely that a reasonable observer, aware of all of the record facts, would have inferred that the court imposed a longer sentence on Rodriguez because of how she came to reside in this country. The sentence was 91 months, which was a 60-month variance below the lower end of the advisory range of 151 to 188 months. That variance resulted from a more generous reduction for substantial assistance than the court usually gave. The court usually reduced a sentence by only one-third, and it found that the only reason Rodriguez had been able to provide as much assistance as she did is that she was one of the masterminds of the fraud. Her crime involved, as the court accurately summarized it, "an extensive scheme" that involved "taking money out of taxpayers' hands" which is "designed to help other

people with disabilities." Still, the court gave her a below-guidelines range sentence. In light of all of the circumstances, including the nature and extent of the multi-million dollar crime, the sentence that was imposed seems, if anything, on the light side of what a reasonable observer would have expected. As for Rodriguez's other premise, even if a reasonable observer would have inferred that Rodriguez's sentence was affected by her national origin, we are not convinced the appearance of that would be reversible error.

Putting aside those problems, and assuming that there was an appearance of bias even though there was no actual bias, and assuming that appearance alone is enough to establish that there was a sentencing error, that error was not plain. In order to be plain enough for the plain error rule, an asserted error must be clear from the plain meaning of a statute or constitutional provision, or from a holding of the Supreme Court or this Court. See United States v. Castro, 455 F.3d 1249, 1253 (11th Cir. 2006); United States v. Chau, 426 F.3d 1318, 1322 (11th Cir. 2005); United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir. 2003). The general language of the Due Process Clause does not make it plain that the appearance of bias, without actual bias, violates that or any other constitutional provision. And Rodriguez has identified no decision, nor have we found one, where this Court or the Supreme Court has held that the appearance of bias is enough by itself to be a

18

constitutional violation.  In <u>Hendrix v. Secretary, Florida Department of Corrections</u>, 527 F.3d 1149 (11th Cir. 2008), we concluded that "there is no Supreme Court decision clearly establishing that an appearance of bias or partiality, where there is no actual bias, violates the Due Process Clause or any other constitutional provision."  <u>Id.</u> at 1153.  <u>See also</u> <u>Whisenhant v. Allen</u>, 556 F.3d 1198, 1209 (11th Cir. 2009); <u>Davis v. Jones</u>, 506 F.3d 1325, 1336–37 (11th Cir. 2007).

The <u>Davis</u> case is instructive on the issue of due process and the appearance of bias.  In <u>Davis</u> the habeas petitioner argued that his due process rights were violated because a judge who presided over one of the hearings in his case was the brother of one of the state's prosecuting attorneys.  506 F.3d at 1326.  As in this case, the petitioner did not claim that there was any actual bias on the part of the judge, but only that the relationship created an "appearance of partiality."  <u>Id.</u>  In arguing that the appearance of bias was enough to violate the Due Process Clause, the petitioner relied heavily on the Supreme Court's decision <u>In re Murchison</u>, 349 U.S. 133, 75 S.Ct. 623 (1955), where the Court had invalidated a Michigan procedure that allowed the same judge to function in both prosecutorial and judicial roles in the same case.[3]  <u>See</u> <u>Davis</u>, 506 F.3d at 1334.  We turned down

---

[3]The judge in <u>Murchison</u>, acting as a one-man grand jury, had compelled two witnesses to testify before him and then charged one with contempt and the other with perjury as a result of

19

that argument, explaining that "our circuit, as well as the Third and Seventh Circuits, already [has] rejected the claim that Murchison holds that an appearance of bias violates the Due Process Clause." Id. (citations omitted). In Davis we also quoted approvingly some language from a Seventh Circuit decision, which, after surveying all of the relevant Supreme Court precedent, concluded, "'[t]he Supreme Court has never rested the vaunted principle of due process on something as subjective and transitory as appearance.'" Id. at 1335 (quoting Del Vecchio v. Ill. Dep't of Corrs., 31 F.3d 1363, 1371–72 (7th Cir. 1994)).

The Supreme Court has decided that in at least some situations the probability of actual bias is enough to violate due process. In Caperton v. A. T. Massey Coal Co., ___U.S.___, 129 S.Ct. 2252 (2009), the Court held that a state supreme court justice was required to recuse himself from a litigant's case where that litigant had made significant contributions to the justice's campaign for office. Id. at 2256–57. The Court's holding, however, was narrow. See id. at 2265. It noted the "extreme facts" of that case and limited its holding to the "extraordinary situation" where the "probability of actual bias rises to an unconstitutional level." Id. There is no probability of actual bias in this case. In fact, Rodriguez concedes that there was no actual bias. So, she has failed to meet the second requirement of

their testimony. See 349 U.S. at 134–35, 75 S.Ct. at 624–25. The same judge then presided at the hearing on the charges and convicted both men of contempt. Id. at 135, 75 S.Ct. at 625.

20

the plain error rule.

Rodriguez has also failed to meet the third requirement of the plain error rule, which is that the error must have affected her substantial rights. Olano, 507 U.S. at 734–35, 113 S.Ct. at 1777–78. Making that showing "almost always requires that the error 'must have affected the outcome of the district court proceedings.'" Rodriguez, 398 F.3d at 1299 (quoting United States v. Cotton, 535 U.S. 625, 632, 122 S.Ct. 1781, 1786 (2002)). The defendant's burden in this respect is a heavy one; she must establish a "reasonable probability of a different result" but for the error. Id. That means that "where the effect of an error on the result in the district court is uncertain or indeterminate—where we would have to speculate—the appellant has not met his burden of showing a reasonable probability of a different result." Id. at 1301.

Rodriguez clearly has not carried the burden of showing that there was a reasonable probability of a different sentence but for the sentencing judge's comments about how Rodriguez came to be in this country or but for the thoughts underlying those comments. She cannot make that showing for the same reasons she cannot show a reasonable observer would infer that the court let the facts about how she came to be in this country affect her sentence. See pp. 17–18, supra. Rodriguez candidly concedes that she cannot show a reasonable probability of

21

prejudice and thus cannot meet the requirements of the plain error rule.

All four requirements of the plain error rule must be met. <u>See</u> <u>Cotton</u>, 535 U.S. at 631, 122 S.Ct. at 1785. For that reason, there is no need for us to address the fourth requirement, which is that the asserted error must have "seriously affect[ed] the fairness, integrity or public reputation of the judicial proceedings." <u>Olano</u>, 507 U.S. at 736, 113 S.Ct. at 1779.

**AFFIRMED.**