[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 2, 2011
JOHN LEY
CLERK

No. 11-10621
Non-Argument Calendar

_____

D.C. Docket No. 1:08-cr-00478-JOF-GGB-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ORLANDO KING,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(November 2, 2011)

Before BARKETT, MARCUS, and FAY, Circuit Judges.

PER CURIAM:

Orlando King appeals his convictions and sentences for conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, and aggravated identity theft, in violation of 18 U.S.C. § 1028A. On appeal, he raises four challenges to his convictions: (1) the district court abused its discretion when it denied his motion to withdraw his guilty plea; (2) there was an insufficient factual basis as to his aggravated identity theft conviction; (3) the court improperly denied his motion for a continuance; and (4) his right to a speedy trial was violated. King also raises four challenges to his sentences: (1) the court's loss calculation was clearly erroneous; (2) the court clearly erred in applying a two-level sophisticated means sentencing enhancement under U.S.S.G. § 2B1.1(b)(9); (3) the court clearly erred in applying a four-level role enhancement under U.S.S.G. § 3B1.1; and (4) the court clearly erred in applying a two-level obstruction of justice enhancement under U.S.S.G. § 3C1.1. For the reasons set forth below, we affirm King's convictions and sentences.

I.

King and his codefendant, Harold Wardlaw, opened business checking accounts at a number of banks and deposited stolen checks into the accounts. After obtaining a stolen check, they would incorporate a business in the name of the check's payee with the Georgia Secretary of State and use the paperwork from

2

the Secretary of State to open a business checking account in the payee's name. They and their co-conspirators would then deposit the stolen check into the newly-opened bank account, withdraw money, and make wire transfers from the accounts. King and Wardlaw's agreement as to the proceeds was that Wardlaw earned 5% for opening the bank accounts and depositing the stolen checks. Wardlaw recruited co-conspirators to assist him in opening bank accounts, depositing checks, and withdrawing funds, and these co-conspirators turned over most of the money from the accounts to Wardlaw. The total intended loss from the stolen checks, an unauthorized credit line, unauthorized loans, and three stolen checks that had not yet been negotiated was $1,617,750.70. The actual loss was $919,436.26.

In a 21-count superseding indictment, King was charged with, among other things, conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count 1), and aggravated identity theft, in violation of 18 U.S.C. § 1028A (Count 14). The district court allowed King to represent himself and directed his attorney to act as standby counsel. On the first day of trial, King moved for a continuance to give him more time to prepare. He had received witnesses' prior statements from the government the week before and a DVD of a witness interview the day before. He had also had trouble communicating with standby counsel from pretrial

detention, and he had not received all of the evidence that standby counsel had sent him. The government agreed to make copies of the missing evidence for him. The court nonetheless continued with the trial. On the second day of trial, King asked that standby counsel be appointed to represent him. The court granted a one-day continuance and stated that it would allow counsel to take recesses throughout the trial when issues arose that he had not had the chance to review.

The next day, the government and King indicated that they had reached a plea agreement, under which King pleaded guilty to Counts 1 and 14. The government agreed that the U.S. Attorney for the Northern District of Georgia would not bring criminal charges against King's mother for her involvement in filing liens against the judges, attorneys, and case agent in this case.

At the plea colloquy, King was placed under oath, and he testified that he had had enough time to discuss the charges against him with his attorney, was satisfied with his attorney's advise and representation, and had discussed the plea agreement with his attorney before signing it. Nobody had forced or threatened King to get him to sign the plea agreement, and nobody had made any promises to him that were not contained in the plea agreement. The government explained the elements of the charges in Counts 1 and 14, and King testified that he had no questions about the charges, and he understood that he was giving up a number of

4

rights by pleading guilty. Finally, King testified that he had committed the acts alleged in Counts 1 and 14 of the indictment. The government presented its factual basis, and King agreed that, if the case went to trial, the government would be able to prove that factual basis. After finding that he was pleading guilty knowingly and voluntarily and that the plea was supported by an independent factual basis, the court accepted King's guilty plea.

King and his attorney both filed motions to withdraw the guilty plea, alleging that the plea was involuntary because King was threatened and under duress when he pleaded guilty. Judge Jack Camp held an *ex parte* hearing on the motion, at which King stated that his attorney had told him that the government would indict his family members if he did not plead guilty. His attorney stated that he had never told King that if he did not plead guilty, his family members would be indicted. Nor had he told King that he should consider the investigation of his family members when deciding whether to plead guilty. The government filed a response.

Camp denied the motion, explaining that King had testified that he understood the charges against him, had committed the acts charged in the indictment, had not been forced or threatened to plead guilty, and was satisfied with his attorney's advice and representation. He had not shown that these

statements were false, and therefore, King had pleaded knowingly, voluntarily, and with the close assistance of counsel. Additionally, denying the motion would conserve judicial resources and prevent the government from being prejudiced.

King filed a motion for reconsideration, after which, his case was reassigned to Judge J. Owen Forrester because a felony criminal complaint had been filed against Judge Camp. Judge Forrester denied the motion for reconsideration after *de novo* review.

In preparing the PSI, the probation officer assigned King a base offense level of 7 for Count 1, a 16-level enhancement under U.S.S.G. § 2B1.1(b)(1)(I) because the total loss was over $1 million, a 2-level enhancement under § 2B1.1(b)(2)(A) because there were ten or more victims, a 2-level sophisticated means enhancement under § 2B1.1(b)(9)(C), a 4-level role enhancement under § 3B1.1(a), and a 2-level obstruction of justice enhancement under § 3C1.1. The obstruction of justice enhancement was due to liens King had filed against the prosecutor, case agent, district court clerk, and a number of judges after he was indicted. King's total offense level was thus 33, and his guideline range for Count 1 was 135 to 168 month's imprisonment. He was also subject to a mandatory two-year term of imprisonment for Count 14, to run consecutively to the sentence imposed for Count 1. King objected to the 16-level enhancement for the intended

loss over $1 million, the sophisticated means enhancement, the role enhancement, and the obstruction of justice enhancement. As to the intended loss, King only objected to being held responsible for the losses in Counts 6, 10-12, 17, and 21.

At the sentencing hearing, U.S. Postal Inspector Jessica Owen testified that she had executed a search warrant at King's house, located at 577 Rankin Street. Prior to executing the search warrant, she had found mail with King's name on it in the trash at that address. Additionally, county tax records showed that King owned the house, and Wardlaw and King's roommate both told Owen that King lived in the house. At King's house, Owen found numerous checks and receipts made out to Insurance Services Office, Sealy, BFP Potomac Tower, Reuters America, Madison Tower Associates. She also found a sheet of paper with "LP" and the account number for the 200 Park LP bank account written on it and three checks that had not yet been negotiated. Finally, Owen testified that Wardlaw told her that King gave him all of the checks he gave to their co-conspirators to deposit. The court found that an intended loss amount of $1,617,750.70 was supported by a preponderance of the evidence.

As to the sophisticated means enhancement, the court explained that obtaining stolen mail, filing articles of incorporation, depositing the checks, and making wire transfers constituted sophisticated means. Next, the court overruled

7

King's objection to the role enhancement because: (1) the conspiracy could not have occurred without King; and (2) even if King was correct that Wardlaw was also a leader, the enhancement could still be applied to King for his leadership role. As to the obstruction of justice enhancement, Owen testified that the liens were filed with the Kentucky Secretary of State, which she knew because King sent a copy of the liens to her and to the U.S. Attorney's Office in Kentucky. Either King or the U.S. Attorney's Office in Kentucky had indicated that the liens were filed in Kentucky. The court found that the liens were worthless, but it overruled King's objection because he had intended to influence the officials to whom he sent the liens. The court then sustained an objection King made to the enhancement for the number of victims, making King's guideline range 108 to 135 months' imprisonment for Count 1. The court sentenced King to 108 months for Count 1 and 24 months for Count 14, to run consecutive. King renewed his objections.

## II.

We review a district court's decision to deny a motion to withdraw a guilty plea for an abuse of discretion. *United States v. Brehm*, 442 F.3d 1291, 1298 (11th Cir. 2006). The district court does not abuse its discretion unless its decision is "arbitrary or unreasonable." *Id.* (quotation omitted). When a party

8

does not object to a judge's alleged bias in the district court, we review for plain error. *United States v. Rodriguez*, 627 F.3d 1372, 1380 (11th Cir. 2010), *cert. denied*, 131 S.Ct. 1840 (2011). The defendant must prove plain error, which exists where: (1) there was an error; (2) that was plain; (3) that affected the defendant's substantial rights; and (4) the error "seriously affected the fairness of the judicial proceedings." *Id.* (quotation omitted). An error generally only affected the defendant's substantial rights if it "affected the outcome of the district court proceedings." *Id.* at 1382 (quotations omitted). Thus, the defendant "must establish a reasonable probability of a different result but for the error." *Id.* (quotation omitted).

The district court may allow a defendant to withdraw a guilty plea after the court has accepted the plea but before it has imposed a sentence if "the defendant can show a fair and just reason for requesting the withdrawal." Fed.R.Crim.P. 11(d)(2)(B). The district court "may consider the totality of the circumstances surrounding the plea." *Brehm*, 442 F.3d at 1298 (quotation omitted). We consider four factors when reviewing the district court's decision: "(1) whether close assistance of counsel was available; (2) whether the plea was knowing and voluntary; (3) whether judicial resources would be conserved; and (4) whether the government would be prejudiced if the defendant were allowed to withdraw his

plea." *Id.* (quotation omitted). A guilty plea is knowing and voluntary if the defendant entered the plea without coercion and with an understanding of the nature of the charges and the consequences of the plea. *United States v. Brown*, 586 F.3d 1342, 1346 (11th Cir. 2009), *cert. denied*, 130 S.Ct. 2403 (2010). When a defendant has received close assistance of counsel and pleaded guilty knowingly and voluntarily, we have declined to give considerable weight or attention to the third and fourth factors. *United States v. Gonzalez-Mercado*, 808 F.2d 796, 801 (11th Cir. 1987).

"There is a strong presumption that the statements made during the [plea] colloquy are true." *United States v. Medlock*, 12 F.3d 185, 187 (11th Cir. 1994). The defendant "bears a heavy burden" to show that statements made under oath at a plea colloquy were false. *United States v. Rogers*, 848 F.2d 166, 168 (11th Cir. 1988). It is up to the district court to determine "[t]he good faith, credibility and weight of a defendant's assertions in support of a motion" to withdraw a guilty plea. *Brehm*, 442 F.3d at 1298 (quotation omitted).

The district court did not abuse its discretion in denying King's motion to withdraw his guilty plea. First, King had close assistance of counsel leading up to his plea. He testified during his plea colloquy that he had had enough time to discuss the charges against him with his attorney, was satisfied with his attorney's

10

advice and representation, and had discussed the plea agreement with his attorney before signing it. In ruling on the motion to withdraw, the court explained that it accepted these statements as true, which was within its discretion. *See Brehm*, 442 F.3d at 1298.

Second, King's guilty plea was knowing and voluntary. He testified during his extensive plea colloquy that nobody had forced or threatened him to get him to sign the plea agreement, nor did anyone make any promises to him that were not contained in the plea agreement. In ruling on the motion to withdraw, the court found that King had not shown these statements to be false, which was within its discretion. *See id.* King also argues on appeal that he felt threatened and coerced to plead guilty because: (1) the court prevented him from preparing a meaningful defense by denying his motion for a continuance; and (2) he feared that his family members would be prosecuted if he did not plead guilty. As to the first, argument, the court recessed the trial when he asked that standby counsel be appointed to represent him, and it stated that it would allow counsel to take recesses during the trial if anything arose that he had not had the chance to review. As to the second argument: (1) King testified that no one made him promises not contained in the plea agreement; (2) the plea agreement only protected his mother from prosecution; and (3) his attorney stated that he never told King that pleading guilty

11

would protect his family members. Therefore, these claims are not supported by the record.

The court also ensured that King understood the nature of the charges and the consequences of pleading guilty. After the government explained the elements of the offenses, King testified that he did not have any questions about the charges. King also testified that he had committed the acts alleged in the indictment and that the government could present evidence to support the factual basis that it presented to the court. Based on these admissions and testimony, the court's finding that King pleaded guilty knowingly and voluntarily was not arbitrary or unreasonable. *See Brehm*, 442 F.3d at 1298. As to the consequences of his plea, King testified that he understood that he was giving up a number of rights by pleading guilty, the possible penalties, and the sentencing process. King's statements at the plea colloquy are presumed to be true. *See Medlock*, 12 F.3d at 187. Therefore, King pleaded guilty knowingly and voluntarily.

Because King had close assistance of counsel and pleaded guilty knowingly and voluntarily, we need not consider whether judicial resources would be conserved or whether the government would be prejudiced if King were allowed to withdraw his plea. *See Gonzalez-Mercado*, 808 F.2d at 801. However, these factors also weigh in favor of affirming the court's denial of the motion. Judicial

resources would not be conserved because the government would again have to prepare for King's trial and pay the travel expenses of its out-of-state witnesses. The government would be prejudiced because one of its witnesses has died since the first day of King's trial, and it would therefore be unable to present the witness's live testimony to the jury. Based on the above, the district court did not abuse its discretion in denying King's motion to withdraw his guilty plea.

Finally, King's argument that we should presume that Judge Camp abused his discretion in denying the motion to withdraw the guilty plea is without merit. King must show plain error to succeed on this argument because he did not argue that Judge Camp may have been biased or impaired before the district court. *See Rodriguez*, 627 F.3d at 1380. King has not established that Judge Camp erred in denying the motion because, as discussed above, it was not an abuse of discretion to do so. King has cited no evidence that Judge Camp denied the motion due to bias or impaired judgment. Nor has King presented any law in support of his assertion that we should *per se* find an abuse of discretion. Moreover, even if King could show an error that was plain, he has not shown that his substantial rights were affected because there is no "reasonable probability of a different result but for the error." *Rodriguez*, 627 F.3d at 1382 (quotation omitted). Judge Forrester reviewed King's motion to withdraw his guilty plea *de novo* and found

13

that King had pleaded guilty knowingly and voluntarily based on his statements during the plea colloquy. Based on the above, the district court did not abuse its discretion or commit plain error in denying King's motion to withdraw his guilty plea.

## III.

We review a district court's acceptance of a guilty plea for an abuse of discretion. *United States v. Frye*, 402 F.3d 1123, 1126 (11th Cir. 2005). Although a defendant waives nonjurisdictional defects by pleading guilty, he may attack the knowing and voluntary nature of his plea on appeal. *Wilson v. United States*, 962 F.2d 996, 997 (11th Cir. 1992). The sufficiency of the evidence supporting a guilty plea is nonjurisdictional. *United States v. Viscome*, 144 F.3d 1365, 1370 (11th Cir. 1998). Under this rule, a defendant also may not argue "that his conduct did not meet the elements of the charges." *United States v. Evans*, 478 F.3d 1332, 1339 n.7 (11th Cir. 2007).

King waived his challenge to the sufficiency of the evidence in support of his guilty plea to aggravated identity theft. The sufficiency of the evidence supporting his conviction is nonjurisdictional. *See Viscome*, 144 F.3d at 1370. Because King does not argue that an insufficient factual basis rendered his plea

involuntary, we will not consider the merits of this claim. *See Wilson*, 962 F.2d at 997.

IV.

A defendant waives all nonjurisdictional defects in his proceedings when he "knowingly, voluntarily, and with the benefit of competent counsel" pleads guilty. *United States v. Yunis*, 723 F.2d 795, 796 (11th Cir. 1984). Jurisdictional errors implicate "a court's power to adjudicate the matter before it." *United States v. Peter*, 310 F.3d 709, 712 (11th Cir. 2002). "Whether a claim is 'jurisdictional' depends on whether the claim can be resolved by examining the face of the indictment or the record at the time of the plea without requiring further proceedings." *United States v. Tomeny*, 144 F.3d 749, 751 (11th Cir. 1998) (quotation omitted). For example, a claim that an indictment did not charge an offense is jurisdictional. *Id.* A speedy trial violation is nonjurisdictional. *Yunis*, 723 F.2d at 796.

As discussed above, King pleaded guilty knowingly, voluntarily, and with close assistance of counsel. *See Yunis*, 723 F.2d at 796. Thus, he waived review of the denial of his motion for a continuance and of any speedy trial violation,

which are nonjurisdictional defects.  *See Tomeny*, 144 F.3d at 751.  Therefore, we will not review these claims.

V.

We review a district court's loss calculation for clear error.  *United States v. Sepulveda*, 115 F.3d 882, 890 (11th Cir. 1997).  Clear error review is deferential, "and we will not disturb a district court's findings unless we are left with a definite and firm conviction that a mistake has been committed."  *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010) (quotations omitted).  If the defendant challenges a factual basis for his sentence, the government must establish "the disputed fact by a preponderance of the evidence" using "reliable and specific evidence."  *Sepulveda*, 115 F.3d at 890 (quotations omitted).  The court may base its factual findings on "facts admitted by a defendant's plea of guilty, undisputed statements in the [PSI], or evidence presented at the sentencing hearing."  *United States v. Wilson*, 884 F.2d 1355, 1356 (11th Cir. 1989).

A defendant who commits a theft offense receives a 12-level enhancement if the loss is more than $200,000, a 14-level enhancement if the loss is more than $400,000, and a 16-level enhancement if the loss is more than $1,000,000.  U.S.S.G. § 2B1.1(b)(1)(G)-(I).  The loss amount "is the greater of actual loss or intended loss."  *Id.* § 2B1.1, comment. (n.3).  "[T]he district court may hold all

16

participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy." *United States v. Dabbs*, 134 F.3d 1071, 1082 (11th Cir. 1998).

The district court did not clearly err in applying a 16-level enhancement for a loss over $1,000,000. King only challenges the losses as to Counts 6, 10-12, 17, and 21, and any arguments as to the remaining counts are thus abandoned. *See United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003) (stating that a party abandons an issue not raised in its initial brief). These losses were in furtherance of the conspiracy because they resulted from King's co-conspirators depositing stolen checks and withdrawing funds from the accounts into which the checks were deposited, which was the aim of the conspiracy. *See Dabbs*, 134 F.3d at 1082.

Additionally, Owen's testimony established that the losses were reasonably foreseeable to King. She testified that Wardlaw stated that King provided him with the checks that he gave to their co-conspirators to deposit. Additionally, she identified documents connected to the transactions in Counts 6, 10-12, 17, and 21, and three checks that had not been negotiated, which were found in King's house. Specifically, Owen identified a receipt for and copy of the $143,359.29 check to Insurance Services Office (Count 6); the invoices and receipts for the $161,681.95

17

and $15,336.80 checks to Sealy, Inc. (Count 10); the $114,458.37 check to BFP Potomac Tower (Count 11); a copy of the $190,910.12 check to Reuters America (Count 12); receipts showing a $93,167.91 deposit, which she determined was of the check to Madison Tower Associates based on the date, account number, and deposit amount as shown on the receipts (Count 17); a sheet of paper with "LP" and the account number for the 200 Park LP Bank of America account written on it (Count 21); and three checks that had not been negotiated, in the amounts of $142,694.10, $22,782.44, and $120,906.12.

Owen's testimony also established that King lived at the house where these documents were found. She testified that prior to executing the search warrant, she found mail with King's name on it in the trash at that address, and tax records showed that King owned the house. Wardlaw and King's roommate both told Owen that King lived in the house. Thus, the court did not clearly err in finding that King was responsible for the losses as to Counts 6, 10-12, 17, and 21 and as to the three checks that had not been negotiated.

## VI.

We review a district court's factual findings as to the use of sophisticated means for clear error. *Ghertler*, 605 F.3d at 1267. A defendant receives a two-level enhancement under U.S.S.G. § 2B1.1(b)(9)(C) if his offense "involved

sophisticated means." *Id.* (quotation omitted).  This enhancement is appropriate where the means used were "especially complex" or the offense or concealment of the offense was "especially intricate." *Id.* § 2B1.1, comment. (n.8).  The enhancement is proper where the "totality of the scheme was sophisticated" even if the individual actions comprising the scheme were not sophisticated.  *Ghertler*, 605 F.3d at 1267.  Using "fictitious entities, corporate shells, or offshore financial accounts" are ordinarily sophisticated.  U.S.S.G. § 2B1.1, comment. (n.8).

The court did not clearly err in applying the sophisticated means enhancement in this case.  Although some of the individual steps involved in this conspiracy may have been unsophisticated—such as depositing checks, incorporating businesses, opening bank accounts, and withdrawing funds from the bank accounts—the "totality of the scheme was sophisticated." *Ghertler*, 605 F.3d at 1267.  The totality of this scheme involved obtaining stolen business checks, incorporating shell companies in the names of the payees on the stolen checks with the Georgia Secretary of State, using the incorporation documents from the Georgia Secretary of State to open business checking accounts, depositing the stolen checks in the accounts, and withdrawing the funds and making wire transfers from the accounts.  King argues that he should not have received this enhancement because the companies were not fictitious entities.  His argument is

19

meritless, as he incorporated shell companies that were not used to conduct business. *See* U.S.S.G. § 2B1.1, comment. (n.8). Accordingly, the court did not clearly err in applying a two-level enhancement for the use of sophisticated means.

VII.

We review a district court's application of a § 3B1.1 role enhancement for clear error. *United States v. Martinez*, 584 F.3d 1022, 1025 (11th Cir. 2009). Under the Sentencing Guidelines, a defendant receives a four-point offense level increase for being "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Relevant factors in determining whether a § 3B1.1(a) enhancement is warranted include:

> (1) exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others.

*Martinez*, 584 F.3d at 1026 (quotation omitted). It is not necessary that every factor is present for the enhancement to be applied in a particular case. A role enhancement is appropriate only where the defendant exercised "some control, influence or decision-making authority over another participant in the criminal

20

activity." It is insufficient that a defendant merely managed the assets of the conspiracy. The enhancement is intended "to address concerns about relative responsibility." *Id.* (quotation omitted). We upheld a role enhancement under § 3B1.1(a) where the defendant recruited and instructed two co-conspirators. *United States v. Ndiaye*, 434 F.3d 1270, 1304 (11th Cir. 2006). More than one member of a conspiracy can qualify as a leader or organizer under this section. U.S.S.G. § 3B1.1, comment. (n.4).

The district court did not clearly err in applying a four-level role enhancement under § 3B1.1(a).[1] *See Martinez*, 584 F.3d at 1025. A number of factors support the application of this enhancement. King organized the entire criminal scheme, obtained the stolen checks without which the conspiracy would have been impossible, and recruited Wardlaw to open the bank accounts and deposit the checks. Thus, the nature of King's participation, his recruitment of his first co-conspirator, and the degree to which he organized the conspiracy all support the application of the role enhancement. *See Martinez*, 584 F.3d at 1026. Next, the evidence showed that King's and Wardlaw's co-conspirators retained only a small portion of the proceeds and that King retained a much larger share of

---

[1] King has waived any argument under § 3B1.1(a) that the criminal activity did not involve at least five participants or that it was not otherwise extensive because he did not raise these issues in his initial brief. *See Jernigan*, 341 F.3d at 1283 n.8.

the proceeds than Wardlaw did. King's claimed share of the profits of the conspiracy thus supports the application of the role enhancement as well. *See Martinez*, 584 F.3d at 1026. The extensive nature and scope of the conspiracy support the application of the enhancement because this conspiracy caused an actual loss of $919,436.26 and an intended loss of $1,617,750.70. *See id.*

As to the final factor, it appears that King exercised control over Wardlaw because King determined the proceeds Wardlaw would receive from the conspiracy; provided the stolen checks to Wardlaw to deposit; and retained documentation for the various transactions involved in the conspiracy, such as copies of checks, the invoices that came with some of the checks, and receipts showing that deposits had been made. *See Martinez*, 584 F.3d at 1026. Therefore, this factor also supports the application of the enhancement.

King also argues that this enhancement was improperly applied because Wardlaw, not King, led the conspiracy. Even if Wardlaw was also a leader or organizer of the conspiracy, that fact would not preclude King from receiving the role enhancement as well because more than one member of a conspiracy can qualify as a leader or organizer. *See* U.S.S.G. § 3B1.1, comment. (n.4).

Based on King's role in organizing this conspiracy and obtaining the stolen checks essential to the conspiracy, his recruitment of Wardlaw, the fact that he

claimed a large share of the conspiracy's profits, the extensive nature and scope of the conspiracy, and King's apparent control over Wardlaw, the four-level role enhancement was properly applied in this case. *See Ndiaye*, 434 F.3d at 1304.

## VIII.

"We review a district court's factual finding of obstruction of justice for clear error" and the application of U.S.S.G. § 3C1.1 to the factual findings *de novo*. *United States v. Snipes*, 611 F.3d 855, 871 (11th Cir. 2010), *cert. denied*, 131 S.Ct. 2962 (2011). A defendant may receive a two-level enhancement for obstructing or impeding the administration of justice where he "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and . . . the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1. "Obstructive conduct can vary widely in nature, degree of planning, and seriousness." U.S.S.G. § 3C1.1, comment. (n.3). The defendant need not be successful in his attempt to impede or obstruct the administration of justice. *United States v. Taylor*, 88 F.3d 938, 944 (11th Cir. 1996).

23

King makes two arguments as to this enhancement. His first—that the district court's only factual finding as to this enhancement was that liens were filed—is belied by the record. The court also found that the liens were legally worthless, but that King intended to influence the officials to whom the liens were sent. His second argument—that the liens were incomprehensible and worthless—does not render this enhancement improper. The obstruction of justice enhancement is applicable even where the defendant did not successfully obstruct or impede the administration of justice. *See* U.S.S.G. § 3C1.1. Here, King did not successfully influence the officials to whom he sent the liens, but as the court found, he did intend for that outcome to occur. Because King attempted to obstruct justice by influencing officials working on his case when he filed and sent the liens, the district court did not clearly err in applying this enhancement. *See Taylor*, 88 F.3d at 944.

For the foregoing reasons, we affirm King's convictions and sentences.

**AFFIRMED.**