Ada VAN HARKEN, et al.,
Plaintiffs–Appellants,

v.

CITY OF CHICAGO, Defendant–Appellee.

No. 95–3997.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 28, 1996.

Decided Jan. 6, 1997.

Dana A. Alden (argued), Alden & Associates, Oak Brook, IL, for plaintiffs–appellants.

Lawrence Rosenthal, Thomas Bamonte (argued), Susan S. Sher, Office of Corp. Counsel, Appeals Division, Chicago, IL, for defendant–appellee.

Before POSNER, Chief Judge, and EASTERBROOK and RIPPLE, Circuit Judges.

POSNER, Chief Judge.

In 1990 the City of Chicago adopted a new system for the adjudication of parking violations. Chi. Munic. Code ch. 9–100. That system is challenged in this class action on behalf of persons who, either having been adjudged liable for a parking violation in contested proceedings under the new procedures and paid their fines or having received a parking ticket and still having time to contest it, claim that the new procedures violate the due process clauses of the United States and Illinois constitutions. The district judge dismissed the suit for failure to state a claim under either constitution. 906 F.Supp. 1182 (N.D.Ill.1995). The City argues that we cannot even reach the merits of the appeal because the suit is a collateral attack on the judgments in the plaintiffs' parking cases, and thus violates the *Rooker–Feldman* doctrine, on which see, e.g., *Young v. Murphy*, 90 F.3d 1225, 1230 (7th Cir.1996). The argument depends upon the undefended assumption that the doctrine applies to administrative as well as judicial decisions. All the circuits to have considered the assumption in a published opinion have rejected it, *Narey v. Dean*, 32 F.3d 1521, 1525–26 (11th Cir.1994);

Scott v. Flowers, 910 F.2d 201, 208 (5th Cir. 1990); Ivy Club v. Edwards, 943 F.2d 270, 284 (3d Cir.1991), and we are not disposed to create an intercircuit conflict on the question.

The basis of the Rooker–Feldman doctrine (see Rooker v. Fidelity Trust Co., 263 U.S. 413, 416, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 476, 103 S.Ct. 1303, 1311–12, 75 L.Ed.2d 206 (1983)) is that only the U.S. Supreme Court has been authorized by Congress to review decisions by state courts. 28 U.S.C. § 1257. The only decisions reviewable under this statute are final decisions "by the highest court of a State in which a decision could be had," 28 U.S.C. § 1257(a), but of course it does not follow that decisions by a *lower* state court are reviewable in federal courts. No statute authorizes such review, and it would be grotesque to allow a disappointed state court litigant to pursue his appeal in federal rather than state court. Worldwide Church of God v. McNair, 805 F.2d 888, 893 n. 3 (9th Cir. 1986); Texaco Inc. v. Pennzoil Co., 784 F.2d 1133, 1142–43 (2d Cir.1986), rev'd on other grounds, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987); Hale v. Harney, 786 F.2d 688, 691 (5th Cir.1986). It might appear by parity of reasoning that a party to a state administrative proceeding is not authorized to bypass the appellate remedy that the state has provided in its own courts by filing an action in federal district court instead. Countless cases, however, allow people who lose in state administrative proceedings to seek relief in federal district court under civil rights legislation such as 42 U.S.C. § 1983; and Patsy v. Board of Regents, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), expressly rejected a requirement of exhausting administrative remedies before suing under that section. We cannot believe that these cases were decided as they were simply because the defendants failed to argue Rooker–Feldman. If the Rooker–Feldman doctrine is to be extended to administrative judgments, it will have to be done by the Court that created it.

■ The City's Rooker–Feldman argument fails on a second ground as well, though here we must be careful to distinguish between the different kinds of relief sought by the suit. Centifanti v. Nix, 865 F.2d 1422, 1429 (3d Cir.1989). Insofar as the plaintiffs merely seek a declaration that the procedures under which the parking charges against them were, or in the case of those members of the class whose cases have not yet been heard will be, adjudicated are constitutionally inadequate, they are not barred by Rooker–Feldman because they are not challenging the judgment in any parking case. Buckley v. Illinois Judicial Inquiry Board, 997 F.2d 224, 227 (7th Cir.1993); see also Nesses v. Shepard, 68 F.3d 1003, 1005 (7th Cir.1995); Dubinka v. Judges of Superior Court, 23 F.3d 218, 222 (9th Cir.1994); Centifanti v. Nix, supra, 865 F.2d at 1429. But insofar as they are seeking refunds of the parking fines imposed upon them, they are barred. The Feldman decision illustrates the distinction. It allowed the plaintiffs in that case to challenge the constitutionality of the rule under which they had been denied admission to the bar, 460 U.S. at 487–88, 103 S.Ct. at 1317–18, while refusing to allow them to challenge the denial itself. If they prevailed on their challenge to the rule, they might or might not be able to get a new hearing on the denial of their applications for admission, and to that extent the Rooker–Feldman doctrine does not prevent a form of collateral attack upon—or, better perhaps, an oblique swipe at—a state court judgment by a suit brought in a federal district court. Our case is the same so far as the declaratory relief sought by the plaintiffs is concerned, and no more is necessary to support jurisdiction.

We come then to the merits. In Illinois before 1987 and in a majority of the states to this day, parking violations were and are technically criminal violations even when the maximum punishment is a modest fine; and the violator was and in the other states is entitled to the usual safeguards of the criminal process. A number of states, however, have decriminalized parking violations and substituted a civil penalty system. See, e.g., Gardner v. City of Columbus, 841 F.2d 1272, 1274 (6th Cir.1988); 1992 Cal.Adv.Leg; see is.Serv. ch. 1244, § 1 (Deering). (Gardner upheld Ohio's system against a challenge similar to that mounted by the plaintiffs in the present case.) Illinois joined these

states in 1987 by authorizing its municipalities to adopt such systems if they wanted. 625 ILCS ¶ 5/11–208.3. Chicago took up the invitation, as we said, in 1990. Under the system, the parking ticket the police officer writes is prima facie evidence of a violation. The owner of the car can either pay the fine written on the ticket (which cannot exceed $100) or challenge the ticket either in writing or in person. These challenges are adjudicated not by regular judges or other employees of the City or State but by private lawyers whom the City hires as part-time hearing officers. The police officer who wrote the ticket is not expected to participate in the hearing, other than through the ticket itself, which is treated as the equivalent of an affidavit. Ordinarily, the only live participant in the hearing besides the hearing officer will be the respondent, that is, the recipient of the ticket. A manual that the City has issued to its hearing officers directs them to conduct a searching cross-examination of the respondent. The hearing officer can subpoena witnesses (including, of course, the police officer who wrote the ticket), and can consider any documentary evidence (photographs, for example) submitted by the respondent. The hearing is tape recorded. If the hearing officer finds a violation and imposes a fine, the respondent can seek judicial review in the Circuit Court of Cook County upon the payment of the normal fee for filing a case in that court, which is $200.

The plaintiffs make two main arguments for why the City's new system for the adjudication of parking violations denies due process. The first is that because such violations have traditionally been treated as criminal offenses, though of the lowest order—below misdemeanors—the state may not reclassify them as civil, and reduce the procedural safeguards required in criminal proceedings, unless it reduces the sanction. Before the new ordinance, the appellants tell us, the maximum fine for a parking violation was $100 and was a criminal punishment; under the new ordinance, the maximum fine is still $100, so it must be a criminal punishment still, and the violator must therefore be entitled to the full panoply of procedural safeguards. Both steps in this argument are wrong. The first also rests on an erroneous factual premise. The maximum fine before the new ordinance was not $100 but $200, *People ex rel. Daley v. Datacom Systems Corp.*, 146 Ill.2d 1, 165 Ill.Dec. 655, 585 N.E.2d 51, 67–68 (1991), although apparently no fine above $100 was imposed. General Order No. 7 of Circuit Court of Cook County, reprinted in *Sullivan's Law Directory* 687c (1995). That is a detail. The important point is that nothing in the due process clause forbids the reclassification of criminal offenses as civil violations. Of course the state would not be permitted by reclassifying murder as a civil violation to impose the death penalty without the procedural protections that the courts have interpreted the Constitution as requiring in capital cases; but the reason would be the severity of the punishment. A criminal fine of $100 is much less severe than many incontestably civil penalties, so if the state decides to convert it to a civil penalty there is no reason to impose the safeguards of criminal procedure. It is extraordinarily common, moreover, for a statute to carry both civil and criminal penalties. If the legislature repeals the criminal penalties, does this mean that the civil penalties, which remain, are now criminal, because they are replacing criminal penalties in those cases in which, before the repeal, the criminal rather than the civil penalty would have been imposed? The implication of the plaintiffs' argument is that the answer is "yes," which shows how strange the argument is. And even if, as we do not for a moment believe, some weird ratchet decreed that once a criminal penalty, always a criminal penalty, nothing in the Constitution prevents a state from relaxing the conventional safeguards of the criminal process in tandem with a lightening of the penalties. *Scott v. Illinois,* 440 U.S. 367, 99 S.Ct. 1158, 59 L.Ed.2d 383 (1979); *Blanton v. City of North Las Vegas,* 489 U.S. 538, 109 S.Ct. 1289, 103 L.Ed.2d 550 (1989); *Duncan v. Louisiana,* 391 U.S. 145, 159–72, 88 S.Ct. 1444, 1452–1461, 20 L.Ed.2d 491 (1968); *United States v. Soderna,* 82 F.3d 1370,

1377–79 (7th Cir.1996); *United States v. Paternostro*, 966 F.2d 907, 913 (5th Cir.1992).

The due process clause is not a straitjacket, preventing state governments from experimenting with more efficient methods of delivering governmental services, in this case the provision of a municipal road system. The traditional system, mindlessly assimilating a parking ticket to an indictment for murder, was archaic and ineffective. See *People ex rel. Daley v. Datacom Systems Corp., supra*, 165 Ill.Dec. at 658, 585 N.E.2d at 54. Its age did not entrench it against reform.

▉ The plaintiffs' second argument is that the procedures prescribed by the new ordinance are inadequate even for civil proceedings. The test for due process in the sense of procedural minima, as set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), requires a comparison of the costs and benefits of whatever procedure the plaintiff contends is required. The use of cost-benefit analysis to determine due process is not to every constitutional scholar's or judge's taste, but it is the analysis prescribed by the Supreme Court and followed by the lower courts including our own. E.g., *United States v. James Daniel Good Real Property*, 510 U.S. 43, 53, 114 S.Ct. 492, 500–01, 126 L.Ed.2d 490 (1993); *Zinermon v. Burch*, 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1990); *McCollum v. Miller*, 695 F.2d 1044, 1048 (7th Cir.1982); *Sutton v. City of Milwaukee*, 672 F.2d 644 (7th Cir.1982); *Chemical Waste Management, Inc. v. EPA*, 873 F.2d 1477, 1483 (D.C.Cir.1989); *Artway v. Attorney General*, 81 F.3d 1235, 1251 (3d Cir.1996). It has become orthodox and we are bound to follow it; nor is it challenged by the plaintiffs.

The costs of procedural safeguards are fairly straightforward, which is not to say easy to quantify. For example, the cost of requiring the police officer who writes the ticket to appear in person at every hearing at which the ticket is challenged—one of the procedural safeguards that the plaintiffs in this case claim is required by the due process clause—depends on the number and length of hearings, the average time the police officer requires to get to and from the hearing, the reduction in his productivity from the interruption of his normal workday that attendance at such hearings requires, and the expense to the City of hiring additional policemen. We were told at argument without contradiction that the City issues 4 million parking tickets a year, of which 5 percent are challenged (200,000), a third of those in person rather than by mail and thus requiring an oral hearing (67,000). If the ticketing officer were required to attend, the number of hearings requested would undoubtedly be higher, because respondents would think it likely that the officer wouldn't show up—a frequent occurrence at hearings on moving violations. Suppose the number of hearings would be double what it is under the challenged procedures (that is, would be 134,000), but the police would show up at only half, putting us back to 67,000; and suppose that a hearing at which a police officer showed up cost him on average 2 hours away from his other work. Then this procedural safeguard for which the plaintiffs are contending would cost the City 134,000 police hours a year, the equivalent of 67 full-time police officers at 2,000 hours a year per officer. In addition, more hearing officers would be required, at some additional cost to the City, because each hearing would be longer as a result of the presence of another live witness. And all these are simply the monetary costs. Acquittals of violators due solely to the ticketing officer's failure to appear would undermine the deterrent efficacy of the parking laws and deprive the City of revenues to which it was entitled as a matter of substantive justice.

The benefits of a procedural safeguard are even trickier to estimate than the costs. The benefits depend on the harm that the safeguard will avert in cases in which it prevents an erroneous result and the likelihood that it *will* prevent an erroneous result. We know the harm here to the innocent car owner found "guilty" and forced to pay a fine: it is the fine, and it can be anywhere from $10 to $100, for an average of $55. We must ask how likely it is that error would be averted if the ticketing officer were present at the hearing and therefore subject to cross-exami-

nation. Suppose that in his absence the probability of an erroneous determination that the respondent really did commit a parking violation is 5 percent, and the officer's presence would cut that probability in half, to 2.5 percent. Then the average saving to the innocent respondent from this additional procedural safeguard would be only $1.38 ($55 × .025)—a trivial amount.

██ These calculations are inexact, to say the least; but they help to show, what is pretty obvious without them, that the benefits of requiring the police officer to appear at every hearing are unlikely to exceed the costs. Assuming that oral testimony is more persuasive in general than written, the only basis on which the plaintiffs can complain about the police officer's absence is that it prevents them from cross-examining him. In short, they are claiming that they have a right of confrontation. There is no absolute right of confrontation in civil cases. See *Richardson v. Perales,* 402 U.S. 389, 402, 407, 91 S.Ct. 1420, 1427–28, 1430, 28 L.Ed.2d 842 (1971). In particular cases, live testimony and cross-examination might be so important as to be required by due process, although the principal case so holding— *Goldberg v. Kelly,* 397 U.S. 254, 268, 90 S.Ct. 1011, 1020–21, 25 L.Ed.2d 287 (1970)—may not have much life left after *Mathews v. Eldridge, supra,* 424 U.S. at 334–35, 96 S.Ct. at 902–03; cf. *Cholewin v. City of Evanston,* 899 F.2d 687, 689–90 (7th Cir.1990). *Goldberg* granted a right of confrontation to persons denied welfare benefits; *Mathews* withdrew it for persons denied disability benefits. The basis for distinction was the hardship to persons taken off welfare, and of course it has no counterpart here. Moreover, the ordinance empowers the hearing officer to subpoena witnesses. That provides an adequate safety valve for those cases, if any (there may be none), in which fair consideration of the respondent's defense would require, as a constitutional imperative, the recognition of a right of confrontation.

██ This discussion disposes not only of the plaintiffs' objection to dispensing with the attendance of the police officer but also of their objection to the hearing officers' being instructed to cross-examine respondents. As the only live witness at the hearing the respondent has a natural advantage over the City, whose only witness, the police officer, is not present to contradict whatever far-fetched tale the respondent thinks up. A searching examination of the respondent is a legitimate counter to this advantage.

This point casts a retrospective aura of unreality over the plaintiffs' complaint about the absence of the ticketing officer. In some cases his absence will hurt the respondent by preventing cross-examination, but in most it will help the respondent by giving him the last word. No net disadvantage to respondents is plausible. It is apparent that substituting the ticket for the officer was designed not to make it more difficult for the respondent to avoid a finding of liability, but merely to save the expense of tying up police officers' time in hearings when they should be out on the street protecting the public safety.

██ The plaintiffs also object to the fact that the hearing officers are hired by, and can be fired at will by, the City's Director of Revenue, who may want to maximize the City's "take" from parking tickets. Actually, this cannot be assumed. The Director of Revenue is appointed by and serves at the pleasure of the Mayor, whose concerns transcend the collection of parking fines. The enforcement of the parking laws is not merely a program for raising revenues; it is also designed to facilitate traffic flow. Compliance, which produces no revenue, may be as important to the City as noncompliance, which produces revenue but also clogs the streets. Compliance is not reliably promoted by absence of fair adjudication of contested parking violations; indeed, if parking fines are assessed randomly, you might as well park illegally, as you are as likely to be fined if you park legally. And drivers are voters, and so cannot be treated with an utter disregard for their predictable indignation at being fined for parking violations that they did not commit.

So it is possible that the plaintiffs are being too cynical about the Director of Revenue. But even if they are not, we do not think that the adjudicative reliability of the hearing officers is fatally compromised by

the manner of their appointment and by their lack of secure tenure. The officers are not paid by the number of hearings that they resolve against the respondent; they are not paid any portion of the fines they impose, as in *Tumey v. Ohio*, 273 U.S. 510, 520, 47 S.Ct. 437, 440, 71 L.Ed. 749 (1927); they have no quota of fines that they must impose on pain of losing their jobs or having their pay reduced; and they have no other financial stake in the outcome of the cases that they adjudicate, as in *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821–25, 106 S.Ct. 1580, 1585–87, 89 L.Ed.2d 823 (1986). If their very indirect, very tenuous stake (a fear that if a hearing officer lets off too many alleged parking violators, the Director of Revenue may get angry and fire him) were enough to disqualify them on constitutional grounds, elected judges, who face significant pressure from the electorate to be "tough" on crime, would be disqualified from presiding at criminal trials, especially in capital cases. They are not. *Bracy v. Gramley*, 81 F.3d 684, 689 (7th Cir.1996).

 The plaintiffs' best case, but not good enough, held that due process prevented a mayor from wearing a second hat as a judge administering his village's traffic and other ordinances that provided for fines and forfeitures. *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972). The mayor did not have a direct pecuniary stake in the decisions of the mayor's court, but his indirect stake was great. Between a third and a half of the village's total revenues came from the fines and forfeitures decreed by the court, *id.* at 58, 93 S.Ct. at 82, so that failure to maintain a stern policy of conviction might make it impossible for him to balance the village's budget. Nothing like that is suggested here, and there is the additional difference that the hearing officers have no municipal governmental responsibilities. If the Director of Revenue or his subordinates were hearing these parking cases, the plaintiffs would have a stronger case. Slightly stronger, at any rate, for the mere fact that an administrative or adjudicative body derives a financial benefit from fines or penalties that it imposes is not in general a violation of due process, *Dugan v. Ohio*, 277 U.S. 61, 48 S.Ct. 439, 72

L.Ed. 784 (1928); *Commonwealth of the Northern Mariana Islands v. Kaipat*, 94 F.3d 574, 580–81 (9th Cir.1996); *Doolin Security Savings Bank v. FDIC*, 53 F.3d 1395, 1405–07 (4th Cir.1995), though in exceptional cases, illustrated by *Ward* and by *United Church of the Medical Center v. Medical Center Comm'n*, 689 F.2d 693, 699–700 (7th Cir.1982), it may be.

The hearing officers are not, it is true, as well insulated from the pressures of their political superiors as administrative law judges. But they are almost certainly cheaper (they receive $35 an hour, with no benefits, and are paid only when they are working), a relevant consideration under the cost-benefit formula of the *Mathews* case; and we must not forget that the maximum penalty that they are empowered to impose is only $100. The less that is at stake, other things being equal, the less process is due; that is the teaching of *Mathews*. With the benefits of stricter procedures as slight as our earlier example suggested they are, the costs that would be incurred in maintaining a corps of "real" judges justify the City's preference for a cheaper alternative.

We conclude that the City's procedures for dealing with parking violations satisfy the requirements of due process. But this conclusion owes nothing to the respondent's appellate remedy. An appeal that, quite apart from the time of the appellant and any attorney's fee, costs more to file than the maximum gain that the appeal can yield the appellant is an illusory remedy. We are unimpressed by the City's argument that it cannot be blamed because it does not fix the fee for filing a case in the circuit court (a state court) and because it lacks statutory authorization to create its own appellate remedy for the parking violators. The first point is irrelevant, because one branch of state government, as the City is for purposes of the Fourteenth Amendment, cannot justify a denial of due process by pointing to the actions of another branch (and the state legislature). See *Lovell v. Griffin*, 303 U.S. 444, 450, 58 S.Ct. 666, 668, 82 L.Ed. 949 (1938). The second is incorrect, since there is nothing to prevent the City from establishing within the Bureau of Parking En-

forcement a tier of appellate hearing officers.

■ We have thus far discussed only the plaintiffs' federal constitutional claim. They also have a state claim, a pendent or as it is now called a supplemental state claim, 28 U.S.C. § 1367, since its only federal jurisdictional handle is the federal claim. The general rule is that when as here the federal claim drops out before trial (here *way* before trial), the federal district court should relinquish jurisdiction over the supplemental claim. E.g., *Boyce v. Fernandes,* 77 F.3d 946, 951 (7th Cir.1996); *Wright v. Associated Ins. Cos.,* 29 F.3d 1244, 1251 (7th Cir.1994). The district judge did not do this, his ground being that the due process clause of the Illinois constitution is a mirror image of the federal due process clause. Of course, this in itself is an interpretation of state law, and the general rule that we have cited is designed to minimize the occasions for federal judges to opine on matters of state law. If, however, an interpretation of state law that knocks out the plaintiff's state claim is obviously correct, the federal judge should put the plaintiff out of his misery then and there, rather than burdening the state courts with a frivolous case. E.g., *Boyce v. Fernandes, supra,* 77 F.3d at 951; *Bowman v. City of Franklin,* 980 F.2d 1104, 1109–10 (7th Cir. 1992). The district judge evidently thought that this case was within this "no brainer" exception to the duty to relinquish federal jurisdiction over the supplemental claim when the main claim drops out before trial.

■ We reaffirm the propriety of the exception; it is important to judicial economy, which is at the heart of the supplemental jurisdiction. And we acknowledge the broad discretion of district judges in making judgments concerning the retention of supplemental claims. But this case, especially because the supplemental claim is based on a state constitution, does not fall within the exception. The Supreme Court of Illinois has held that the due process clause of the Illinois constitution is not coterminous with that of the federal constitution. In both *People v. McCauley,* 163 Ill.2d 414, 206 Ill. Dec. 671, 678–87, 645 N.E.2d 923, 930–39 (1994), and *Rollins v. Ellwood,* 141 Ill.2d 244,

152 Ill.Dec. 384, 396–401, 565 N.E.2d 1302, 1314–19 (1990), the court found that the federal due process clause was not violated but the Illinois due process clause was. From cases cited by the City dealing with specific aspects of due process pertinent to this case, such as when a proceeding is "really" criminal and when administrative decision-makers must be disqualified for bias, *Rehg v. Illinois Dept. of Revenue,* 152 Ill.2d 504, 178 Ill.Dec. 731, 736–39, 605 N.E.2d 525, 530–33 (1992) (overruled by *Wilson v. Department of Revenue,* 169 Ill.2d 306, 214 Ill.Dec. 849, 662 N.E.2d 415 (1996), on grounds not relevant to this particular question); *E & E Hauling, Inc. v. Pollution Control Board,* 107 Ill.2d 33, 89 Ill.Dec. 821, 824–25, 481 N.E.2d 664, 667–68 (1985), it appears unlikely that the Illinois courts would find a denial of Illinois due process in Chicago's parking ordinance, but it is not so unlikely that the plaintiffs should be denied an opportunity to try to persuade them.

■ It is true that they have not as yet presented a convincing argument that the Illinois courts would reach a different result by interpretation of the state constitution than we reach by interpretation of the federal. But that was not their burden. The presumption is in favor of dismissing the state claim *without* an examination of the merits, when the federal claim falls out before trial, especially where as in this case there has been almost no discovery or other pretrial preparation. E.g., *Graehling v. Village of Lombard,* 58 F.3d 295, 299 (7th Cir. 1995). We have explained that the presumption is rebuttable. But it is not to be ignored, and it is strengthened when the state claim is based on the state constitution— imagine if a federal court were to hold that although Chicago's new system of adjudicating parking violations does not violate the federal constitution, it violates the state constitution. The district judge should not have challenged the plaintiffs to make a convincing state constitutional argument to him. *Ball v. Renner,* 54 F.3d 664, 669 (10th Cir.1995). The judgment of the district court is therefore modified to make the dismissal of the

plaintiffs' state claims without prejudice to their being refiled in state court.

MODIFIED AND AFFIRMED.