[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-10122

_____

HILDA BRUCKER,
JEFFERY THORNTON,
JANICE CRAIG,
BYRON BILLINGSLEY,

Plaintiffs-Appellants,

*versus*

CITY OF DORAVILLE,
a Georgia municipal corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:18-cv-02375-RWS

_____

Before NEWSOM, BRANCH, and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

The plaintiffs in this lawsuit—Hilda Brucker, Jeffery Thornton, Janice Craig, and Byron Billingsley—accuse the City of Doraville, Georgia, of violating their right to due process. Each of the four plaintiffs received citations from the City for traffic or property code violations, were convicted of those violations, and were ordered to pay fines and fees by the municipal court. They allege that this process presented an unconstitutional risk of bias because the City's budget heavily relies on fines and fees, and this reliance could encourage the judge, prosecutor, and law enforcement agents—all paid by the City—to overzealously enforce the law. The upshot of this risk of bias, they contend, is that the City's financial dependence on fines and fees is unconstitutional. We disagree. It may be unwise for a government to rely on fines and fees to balance its budget. But the importance of fines and fees to a city's budget does not make its procedures for imposing fines and fees unconstitutional. The district court therefore correctly granted summary judgment to the City, and we affirm.

# I. Background

## A. Factual Background

The City of Doraville, Georgia, is governed through its city council, which makes final decisions on its budget. The City mainly uses its general fund to pay for its operations. From 2015 to 2019, roughly 11 to 25 percent of that fund consisted of fines and fees collected through the City's municipal court. That percentage has trended downward over time, and the parties dispute whether it is high compared to those of similar cities. But the City has shown that it considers the municipal court to be an important source of funds. For example, a government newsletter stated that "bringing in over $3 million annually, the court system contributes heavily to the city's bottom line." And when a glitch in the court's scheduling system caused delayed court dates, the City created an "action plan" to "restore municipal court fines and forfeitures to previous levels."

The City's laws are administered in relevant part by four entities: the municipal court, the prosecutor, the police department, and the code enforcement agents.

### 1. Municipal Court

The municipal court consists of a single judge, and a court clerk manages its operations. The judge's work consists largely of

bench trials and sentencing for traffic citations, misdemeanor criminal charges, and city ordinance violations.

The court once employed three judges, but the other two were terminated due to budgetary constraints. The current judge has been in office for twenty-eight years. The City has cut his employment benefits for financial reasons, but he is paid a fixed amount independent of case outcomes. And he believes that he can be terminated only for cause. The judge has very little interaction with other parts of the City government, and he has not spoken to a city council member or the mayor in years. He does not report to or receive direction from anyone within the City. He has no executive authority or input on the City's finances, and he is unaware of how much revenue his court generates. Parties can appeal the municipal court judge's decisions to the Superior Court of DeKalb County. Doraville, Ga., City Charter § 3.05.

### 2. Prosecutor

The prosecutor is a contractor that serves at the pleasure of the city council. He is paid a fixed amount for every court session. Those sessions occur twice per week. When defendants want to contest or negotiate their citations instead of paying the court clerk, they speak with the prosecutor. If they reject his plea offer, he sends the case to the judge for a bench trial or to state court. The prosecutor does not file cases arising from police citations, and he does not control the court schedule.

In his role as prosecutor, he has no executive responsibility for the City's finances and is not involved in budgetary decisions. He does sometimes share the role of city attorney with his brother. And the city attorney has attended city council meetings where budget documents were discussed. But it is usually the brother that attends those meetings, and his participation focuses on non-budgetary policy matters. The prosecutor has stated that no one has ever directed him to perform his duties in a way that furthers the City's budgetary interests.

### 3. Police Department

The City's police issue citations, file charges, and try their own cases before the municipal court. In recent years, roughly half of the general fund has gone to the police department. The chief of police makes budget proposals for the police department based on its forecasted expenditures. He has stated that the city council has never directed him or his officers to increase enforcement to meet budgetary expectations. Nor has the department used quotas for the number of citations issued.

### 4. Code Enforcement

The City contracts with a private company to enforce its property code. The City periodically renews the contract, and it pays the code enforcement officers at an hourly rate. Through the city manager, the city council can direct the firm to focus on particular priorities. Code enforcement costs much more money than

it generates, and revenues from code enforcement amount to less than 10 percent of the fines and forfeitures collected by the City.

## B. Procedural Background

Each of the plaintiffs was cited for a traffic or property code violation. They later filed a civil rights action against the City under 42 U.S.C. § 1983 and 28 U.S.C. § 2201. They alleged that the City violated their procedural due process rights through biased adjudication, prosecution, and law enforcement.

The City moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), which the district court denied. Both parties later cross-moved for summary judgment. The district court denied the plaintiffs' motion, granted the City's motion, and entered final judgment. It reasoned that, although the City relies heavily on revenues from fines and fees, the municipal court judge experiences no pressure to generate those revenues and lacks executive authority over finances. It concluded for similar reasons that the prosecutor was not biased, emphasizing that the standard of impartiality is much lower for prosecutors. As for the police, the court did not find a link between fine revenue and police staffing. And it concluded that the City does not direct police operations to increase revenue. Finally, it found that the code enforcement agents were not biased because they generate a small portion of penalty revenue, operate at a loss, and are paid a flat hourly rate. It thus granted summary judgment on all the claims to the City. The plaintiffs then timely filed their notice of appeal.

## II. Standard of Review

This Court reviews the district court's grant of summary judgment *de novo*, "construing the facts and drawing all reasonable inferences in favor of the nonmoving party." *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1152 (11th Cir. 2020). Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994)).

## III. Discussion

It is undisputed that the City raises a substantial percentage of its funds by imposing fines and fees for traffic violations and the like. There is no doubt, therefore, that the City as a governmental entity has an actual financial interest in imposing fines and fees—it gets the money. So the question for us is: Does the City's financial interest create an actual bias or a constitutionally unacceptable risk of bias that transfers to the City's employees? Specifically, the plaintiffs argue that the municipal court judge, the prosecutor, the police officers, and the code enforcement agents all were infected

8                    Opinion of the Court                    21-10122

with a risk of bias that violated the plaintiffs' due process rights. The City argues that its interest in revenue is not transferable to its individual employees, especially its judge. We examine each of these municipal employees in turn.[1]

### A. Municipal Court Judge

We'll start with the judge. Under the Due Process Clause, the plaintiffs were entitled to an "impartial and disinterested tribunal." *Harper v. Pro. Prob. Servs. Inc.*, 976 F.3d 1236, 1241 (11th Cir. 2020) (quoting *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980)). A judge cannot have an actual bias, and, in some situations, the mere "probability of actual bias" is "too high to be constitutionally tolerable." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 877, 886–87 (2009) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). Ultimately, a judge flunks this constitutional test if he or she has an interest that "would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused." *Ward v. Vill. of*

---

[1] The City also argues that the *Rooker-Feldman* doctrine precludes us from reviewing the merits of the plaintiffs' claims. We disagree. The *Rooker-Feldman* doctrine prevents federal district courts from reviewing or overturning state court judgments. *Behr v. Campbell*, 8 F.4th 1206, 1212 (11th Cir. 2021). But *Rooker-Feldman* is a narrow doctrine with limited applicability. *Id.* And we have specifically held that it did not apply in a case, like this one, where a plaintiff sought damages for a procedural due process violation arising from state court proceedings. *Id.* at 1213.

*Monroeville*, 409 U.S. 57, 60 (1972) (cleaned up) (quoting *Tumey v. Ohio*, 273 U.S. 510, 532 (1927)). With respect to financial interests, a judge can be disqualified by his own financial interests or by the interests of the government that he serves. *See Harper*, 976 F.3d at 1241–42. But to be biased by the government's financial interests, the Supreme Court has held that the judge must have some executive responsibility over its finances that may tempt him or her to forsake impartiality. *See Ward*, 409 U.S. at 60; *Dugan v. Ohio*, 277 U.S. 61, 63–65 (1928).

As a preliminary matter, the plaintiffs argue that we should evaluate the bias of the whole City government instead of limiting our analysis to the judge as an individual. To this end, they rely on our decision in *Harper v. Professional Probation Services Inc.*, 976 F.3d at 1243–44, in which we held that a for-profit probation administration company had an unconstitutional interest in enhancing probationers' sentences where it received money for every month they remained on probation. *Id.* We looked to the financial interests of the for-profit company as an entity, not those of its individual employees, because the company had allegedly promulgated a "policy or custom" that made its employees' conduct part of "one central scheme" that caused the constitutional violation. *Id.* at 1244 n.10; *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Among other things, the plaintiffs in *Harper* alleged that the for-profit company "maximize[d] its profit by extending" the length of probation, increasing "the amount of fines from what was ordered at sentencing," and "present[ing] unsworn and

inadequate—or sometimes false—statements" at probation review hearings. *Harper, et al. v. Professional Probation Services, Inc., et al.*, Second Amended Complaint, Doc. 56 at 26–28, 2:17-cv-01791 (Apr. 23, 2018).

We think *Harper* is inapposite. The most obvious difference between this case and *Harper* is that the judge is the sole decisionmaker in the matters coming before him, and he receives no direction from the rest of the City or its leadership. Unlike in *Harper*, the plaintiffs have failed to point to any policy or custom guiding the disposition of individual cases. Granted, they argue that the City has a practice of relying on fines and fees for funding. They say the City has a "policy, practice, and custom of budgeting for, and relying on, revenue from fines, fees, and forfeitures generated by its code enforcement, policing, and municipal court systems." But that budget policy does not purport to control the judge's disposition of individual cases. At one time, the City's finance department formed an "action plan" to "restore Municipal Court fines and forfeitures to previous levels." But that plan involved the court clerk resolving "scheduling issues" that caused late and infrequent court sessions. Those efforts did not concern the judge or purport to direct or guide his decision-making.

We are also convinced that to read *Harper* as the plaintiffs suggest would ignore the Supreme Court's on-point decisions in *Ward* and *Dugan*. In each of those cases, fines and fees went to the city, not the mayor who imposed them, but the Supreme Court scrutinized only the mayor's impartiality as a separate adjudicator.

In *Dugan*, the Supreme Court held that the mayor was sufficiently unbiased to adjudicate fines and fees because his functions were exclusively judicial, and he did not exercise the city's executive power. *See Dugan*, 277 U.S. at 65 ("The mayor has himself as such no executive, but only judicial, duties" so "[h]is relation . . . to the fund contributed to by his fines as judge, or to the executive or financial policy of the city, is remote."). Conversely, in *Ward*, the Supreme Court held that adjudication by a municipal mayor violated due process because he had some control over the expenditure of the moneys that were raised. *See* 409 U.S. at 60 (A "'possible temptation' may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court."). If the plaintiffs' argument were correct here, then *Ward* and *Dugan* would have been much more straightforward: the Court would have looked to the City's interest as a whole, held both mayors to be biased, and would have done so in *Ward* without any showing that the mayor controlled the city's finances. Because there is nothing to connect the City as an entity to the judge's disposition of particular cases, we limit our analysis to whether the judge suffers any biases himself.

Turning now to the municipal judge as an individual officer, the plaintiffs do not argue that the judge was actually biased by his own financial or other interests. Instead, they argue that the judge has a constitutionally unacceptable risk of bias. First, they contend, and it's undisputed, that the judge has a financial interest in keeping

his job. Second, they assert—and, again, it is undisputed—that the City depends on revenues from fines and fees. Therefore, they reason that there is an unconstitutional risk that the judge will be biased toward generating revenue to preserve his job. Although no one disputes the plaintiffs' premises—that the judge has an interest in keeping his job and the City's budget relies on fees and fines— we cannot agree with their conclusion.

The fact that a judge works for a government, which gets a significant portion of its revenues from fines and fees, is not enough to establish an unconstitutional risk of bias on the part of the judge. In arguing as much here, the plaintiffs invoke the principle stated in *Caperton v. A.T. Massey Coal Co.* that a judge may be disqualified because of an unconstitutional "potential for bias." *See* 556 U.S. at 881. Of course, we do not dispute that principle. But it is not broad enough to disqualify Doraville's municipal court judge.

*Caperton* was an "exceptional case" dealing with "extreme facts," *id.* at 884, 886–87, and its holding "was narrow." *United States v. Rodriguez*, 627 F.3d 1372, 1382 (11th Cir. 2010). There, an elected judge had received millions of dollars in campaign contributions from a single donor. *Caperton*, 556 U.S. at 884–85. Meanwhile, that same donor's company was a party to high-stakes litigation that would foreseeably come before the newly elected judge. *Id.* at 886. Given the donor's "significant and disproportionate influence" on the election, together with "the temporal relationship between the election and the pending case," the judge presented an unconstitutional risk of bias. *Id.* at 886–87.

There is a world of difference between a judge who owes his or her job to an individual campaign donor with a strong financial interest in a single important case and one who works for a government with a negligible financial interest in any particular case. After all, every judge works for a government of some kind and, therefore, has some interest in the government's finances. It may be theoretically possible for such an interest to rise to the level of an impermissible risk of bias. But the record here convinces us the judge does not present that risk. *See Alpha Epsilon Phi Tau Chapter Hous. Ass'n v. City of Berkeley*, 114 F.3d 840, 845 (9th Cir. 1997) ("Whether an institutional motive is 'so strong' to violate due process is obviously a matter of degree.").

First, the judge and the City both believe that he can be fired only for cause. Specifically, the City says that it can remove him only for misconduct, intemperance, and the like under Georgia Code § 36-32-2.1. That statute requires a two-thirds' vote of the municipal council to remove a judge for cause during his term. Ga. Code § 36-32-2.1(b)(1). The judge agrees with the City.

The plaintiffs argue that the City and the judge are wrong. They cite Georgia Code § 36-32-2(a), which says that "[a]ny individual appointed as a judge under this Code section shall serve for a minimum term of one year and until a successor is appointed or if the judge is removed from office as provided in Code Section 36-32-2.1." Based on that Code section, they say that the City can fire the judge for any reason because his contract term expired after one year and he has not signed a new contract since joining the

City many years ago. They also assert that the City conceded the judge's at-will status in an admission under Federal Rule of Civil Procedure 36.

Whether the judge is an at-will or for-cause employee is less than perfectly clear from this record, but what is clear is that both the City and the judge believe he is the latter. The plaintiffs assert that the judge's contract term expired long ago, but cite no evidence supporting their assertion that the judge's contract term was limited to one year. When the judge testified about his employment agreement, he did not mention that it specified any term length at all; in fact, he believed that he was still serving his term after more than twenty years. Moreover, contrary to the plaintiffs' arguments, the City did not admit that it could fire the judge without cause; instead, the City admitted that it is under no obligation to re-appoint the judge once his term expires. But, like the judge, the City's position is that the judge's term has not yet expired. So the City's admission does nothing to suggest that the judge serves at the pleasure of the City.

Ultimately, we need not definitively determine the effect of Georgia's removal protection statute here. We are concerned only with whether there is an unconstitutional lack of independence. *See Tumey*, 273 U.S at 532. And we cannot say that the impartiality of the judge fatally suffers because of his employment status. The judge's indirect stake in each case as it relates to his job is not concrete enough to disqualify him on constitutional grounds. Every judge who is not appointed for life with a guaranteed salary faces

some indirect pressure from the reappointing authority. *See Van Harken v. City of Chicago*, 103 F.3d 1346, 1353 (7th Cir. 1997) (rejecting due process claim on this ground). But, because neither the judge nor the City believes that he can be fired at will, there is no substantial reason for him to fear losing his job based on his rulings. In fact, it seems likely that the City's position in this litigation will prevent it from attempting to terminate him without cause in the future. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (discussing doctrine of judicial estoppel).

Second, it is undisputed that the judge is largely ignorant of the City's budgetary needs. To be sure, he seems to be generally aware of the City's past financial struggles and the resulting necessity of job cuts. And the City has publicly touted its reliance on municipal court revenues. But he is unfamiliar with the particulars of the City budget, plays no role in its preparation, and does not know the amount of revenues generated by his court.

Third, it is also undisputed that the judge's case-specific decisions are neither formally nor informally under the control of the City's leadership. The judge does not formally report to anyone in the City, and no one gives him direction on any aspect of his job. The City's leadership has not pressured the judge to generate revenues—either in a general sense or in any particular case. And he has not even spoken with a city council member or the mayor in years.

We cannot say that a judge in this position—whose employer disclaims any ability to fire him except for cause, who has

only a passing knowledge of the City's budget, who has never been pressured in any way, and who does not formally report to any-one—suffers from the kind of interest at issue in *Caperton*.

The plaintiffs make a few other arguments in the alternative. They are also unpersuasive.

First, even if the judge is not biased by his financial interest in his job, the plaintiffs say he is potentially biased by the institutional interests of the City. They assert that, because the municipal court funds much of the City budget, the judge could be motivated to serve the City by producing more revenue. But they have failed to show that the judge has any executive responsibility over the City's finances that might compromise his impartiality. *See Ward*, 409 U.S. at 60; *Dugan*, 277 U.S. at 63–65. On the contrary, he has never been vested with executive authority over financial matters and has never been involved with the City's budgetary decisions. Because the judge has no executive authority, he is not biased by the City's institutional interests. *See id.*

Second, the plaintiffs assert that the judge is disqualified by systemic "selection bias" because the City might tend to hire judges that convict more often. This argument is unpersuasive. There is no sign that the City has expressed such a hiring preference or that it has ever fired a judge because of a failure to convict. Nor have the plaintiffs established that this particular judge has a suspiciously high rate of conviction. So the plaintiffs' argument is simply speculation.

Moreover, the only authority that the plaintiffs cite—*Brown v. Vance*, 637 F.2d 272 (5th Cir. Jan. 1981)—does not support their expansive "selection bias" theory. In that case, arresting officers could choose which of multiple judges received a flat fee for hearing a case. *Id.* at 275. The Fifth Circuit held that this arrangement violated due process because judges might "compete for business by currying favor with arresting officers or taking biased actions to increase their caseload." *Id.* at 282. In Doraville, by contrast, the judge has no one to compete with because he is the only judge on the municipal court. And his salary is independent of his caseload, so he would have no financial incentive to convict even if there were other judges. The plaintiffs' reliance on *Brown* is therefore inapt, and their "selection bias" argument is too remote and speculative to establish a due process violation.

## B. Prosecutor

Nor is there a genuine dispute over the prosecutor's risk of unconstitutional bias. The constitutional standard of impartiality is less stringent for prosecutors than it is for judges. *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810–11 (1987) (plurality opinion). "Prosecutors need not be entirely 'neutral and detached'" and can be "zealous in their enforcement of the law." *Jerrico*, 446 U.S. at 248 (quoting *Ward*, 409 U.S. at 62). Yet "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process . . . raise[s] serious constitutional questions." *Id.* at 249–50.

The plaintiffs argue that Doraville's prosecutor has a financial incentive to bring more cases because, like the judge, his income supposedly depends on his ability to generate revenue for the City. They specifically assert that he is compensated for each court session he attends, that he can be dismissed at-will by the City, that the mayor has advocated for tougher law enforcement, and that the City has publicly discussed its reliance on municipal court revenues.

It is true that the prosecutor receives $500 per court session. But importantly, that compensation is not directly contingent on the number of cases he prosecutes. Instead, he bills the City for two regularly scheduled court sessions every week. The prosecutor has little control over the frequency of those sessions: the municipal court clerk oversees scheduling, and law enforcement officers mostly file charges themselves. In short, the prosecutor's pay does not depend on the number of cases he handles. This compensation structure does not raise significant due process concerns.

Unlike the judge, the prosecutor acknowledges that he can be fired at-will. But that fact alone is not enough to create a due process violation. Cf. Van Harken, 103 F.3d at 1353. Even assuming the prosecutor has some knowledge of the City's budget, the City's leadership has never pressured him to generate revenue. The mayor did say in a meeting that someone should "crack down in the court system instead of the little slap on the hand." But the prosecutor never heard that statement, so it could not have led him to fear for his job. So, given the relaxed standard of impartiality for

prosecutors, the plaintiffs have presented inadequate evidence that the prosecutor had a personal financial interest.

The plaintiffs also argue that the prosecutor might be biased by the City's institutional interests because he sometimes serves as the city attorney. Like judges, prosecutors can be impermissibly biased "by the prospect of institutional gain as a result of zealous enforcement efforts." *Jerrico*, 446 U.S. at 250. But as we have explained, the Constitution's impartiality requirements are no more stringent for prosecutors than they are for judges. *Id.* So we infer that, as with judges, a prosecutor cannot be biased by an institutional interest unless he has executive responsibility over the institution's finances. *See Dugan*, 277 U.S. at 63–65.

The plaintiffs have failed to show that the prosecutor has any such responsibility. It is true that he sometimes shares the role of city attorney with his brother, and the city attorney has attended city council meetings where budget documents were discussed. But his participation in those meetings is apparently limited to non-budgetary policy matters. Indeed, the prosecutor testified that he lacks "any executive authority to act on the city's behalf with regard to its finances, its budgeting for, receipt of, or spending of city of municipal court revenue." The plaintiffs have thus failed to raise a genuine issue of material fact related to the prosecutor's institutional bias as well.

### C. Police

The plaintiffs also allege Doraville's police have a financial interest in issuing tickets. Specifically, the plaintiffs assert that, because over half of the City's general fund is committed to the police department, and because the City relies on municipal court revenue, officers have an improper interest in issuing citations to support the department's funding. Police officers enforce Doraville law, file charges, and try their own cases. We thus apply the same standard of impartiality to them as we do to prosecutors. *See Young*, 481 U.S. at 810–11 (plurality opinion); *Jerrico*, 446 U.S. at 250–51.

We cannot say that the City's budgetary reliance on fines and fees means the police have an improper interest in over-enforcing the law. The Supreme Court addressed a similar argument in *Marshall v. Jerrico*, 446 U.S. at 250–51. There, it concluded that an enforcement official had no personal financial interest in over-enforcing a law. The Court explained that the officer received a fixed salary and was not subject to other personal financial pressures. *Id.* at 250. Similarly, the police officers' compensation is not tied to the citations they issue, and the plaintiffs have not argued that officers are at risk of termination for failure to issue citations. They therefore lack a personal financial interest in vigorous enforcement.

As for an institutional interest, the Court in *Jerrico* determined that there was only a remote possibility that the official would be swayed by the financial needs of his department. *Id.* at

250. It reasoned that his office received funding based on the expenses it incurred, not on the amounts of penalties it collected. *Id.* at 251. It also noted that funds from penalties were shared among various other offices, *id.*, and that penalties represented less than one percent of his agency's budget. *Id.* at 250. So too here, the police department's funding is based on its projected expenses, not on the amount it collects from penalties. And penalty funds are spread out over eighteen other departments, with the city council making final budget decisions. As in *Jerrico*, these facts cut against finding that officers have an institutional interest that would violate the Due Process Clause. *See id.* at 251.

That said, we recognize that the budgetary impact of the fines and fees collected in Doraville is greater than that of the funds in *Jerrico*. Around half of Doraville's general fund goes to the police department, and roughly 11 to 25 percent of that fund came from fines and fees over the last five recorded years. Assuming that no funds are earmarked for the police department, then 11 to 25 percent of the funds going to that department consist of fines and fees. That percentage is significantly higher than the "less than 1%" figure in *Jerrico*. *See* 446 U.S. at 245.

Even so, we are skeptical that this percentage figure alone establishes bias. The City could easily manipulate this figure by raising overall revenue or by earmarking funds to the police—all the while holding fines and fees constant. And 11 to 25 percent is still a far cry from the kind of bounty system that raises core due process concerns. So, even though the percentage is greater here

than it was in *Jerrico*, it is too low for us to conclude that the police department was "financially dependent on the maintenance of a high level of penalties." *Id.* at 251. We therefore conclude that summary judgment was correctly granted on this issue.

## D. Code Enforcement

Finally, we address the due process implication of the City's code enforcement. The City hires an outside firm to enforce the property code. The plaintiffs argue that the code enforcement agents could be biased because they have "unquestioned discretion to issue citations" and have "so much financially riding on them." It is undisputed that the firm is paid hourly, that its contract is periodically evaluated and renewed, that the city council can direct it to police certain neighborhoods, and that property code citations have risen sharply in the past five years.

Because the code enforcement agents are paid hourly, they have no direct financial interest in issuing citations. *See Dugan*, 277 U.S. at 65 (holding that a mayor whose salary derived from a general fund to which criminal fines accumulated was not interested in the fund). True, the City could decline to renew the company's contract for failing to bring in enough revenue. But, as we discussed in relation to the prosecutor, that possibility alone is too remote to create an unconstitutional risk of bias. In fact, it is even more remote here because the code enforcement agents contribute less than 10 percent of the total revenue from fines and forfeitures. Even more obviously, the code enforcement agents lack an

institutional financial interest because they represent an outside contractor without executive responsibility in the City. *See id.* at 63–65. So no reasonable jury could find that the code enforcement officers had an unconstitutional risk of bias.

## IV. Conclusion

The plaintiffs have not raised a genuine issue of material fact concerning the bias of Doraville's judge, its prosecutor, its police, or its code enforcement agents. The district court therefore correctly granted summary judgment, and we **AFFIRM**.

21-10122                  Newsom, J., Concurring                    1

NEWSOM, Circuit Judge, concurring in the judgment:

I concur in the Court's judgment but write separately to emphasize two points.  First, while I agree that the adjudications rendered by the City of Doraville's municipal judge don't violate the Due Process Clause, that conclusion, for me, is bound up in the specific—and somewhat unique—circumstances of this case.  Second, in a different case, with different facts, I might well reach a different decision:  If a municipality heavily dependent on fines and fees employed a judge who not only was reliant on the city for his salary but also was terminable at will, the judge's precarious position probably would, in my mind, give rise to an unconstitutional "'possible temptation'" to bias.  *Ward v. Vill. of Monroeville*, 409 U.S. 57, 60 (1972) (quoting *Tumey v. Ohio*, 273 U.S. 510, 532 (1927)).

The oft-repeated standard for whether a situation presents an unconstitutional risk of judicial bias is whether it "is one 'which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused.'"  *Id.* (quoting *Tumey*, 273 U.S. at 532).  As I understand the law, there are two ways in which such a temptation can arise.  First, a judge might be *institutionally* biased—*i.e.*, she might be predisposed to convict in order to advance the interests of the institution she serves.  *See id.* (noting that a "mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the

2                    Newsom, J., Concurring                    20-14846

mayor's court"); *Tumey*, 273 U.S. at 535 (concluding that a village's mayor-judge was unconstitutionally biased because of his "official motive to convict . . . to help the financial needs of the village"). Second, a judge might be *personally* biased as a result of his own financial interests. *See Tumey*, 273 U.S. at 535 (concluding that a judge who was paid based on his number of convictions had an unconstitutional "direct pecuniary interest in the outcome" of his cases).

I agree with the Court that Doraville's municipal judge doesn't suffer from an impermissible *institutional* bias. It's undisputed that the judge has no executive responsibility for Doraville's finances that would give rise to such a bias. *See Ward*, 409 U.S. at 60. And while Doraville itself has a financial interest in convictions, and the judge is employed by the City, that relationship alone—as the Court rightly points out, *see* Maj. Op. at 12–13—doesn't create a sufficient temptation for the judge to convict in order to advance his employer's interests, *see Dugan v. Ohio*, 277 U.S. 61, 63–65 (1928) (holding that it was constitutionally permissible for a mayor to serve as the municipal-court judge when he exercised no executive functions and received a fixed salary).[1]

---

[1] I don't think that our decision in *Harper v. Professional Probation Services, Inc.*, 976 F.3d 1236 (11th Cir. 2020), requires a different result. In *Harper*, we held (1) that a private company—Professional Probation Services—performed a judicial function when it imposed binding sentencing enhancements and (2) that it had an unconstitutional financial interest in the outcomes of its sentencing decisions. *Id.* at 1244. Here, it's clear that the City of Doraville has a financial interest in the outcomes of the cases heard by its municipal judge. But

21-10122              Newsom, J., Concurring                3

With respect to the judge's *personal* financial interest—which includes both his income and his presumable desire to keep his job—I see this as a close case, the resolution of which turns on the specific circumstances surrounding Doraville's judge. While the parties agree that the judge's salary doesn't vary based on the number of convictions he delivers, they dispute whether the City can legally terminate the judge at will—which would allow it to fire him if he doesn't deliver enough convictions—or whether he enjoys for-cause removal protection. The truth of the situation is difficult to discern. On the one hand, Doraville did, in fact, lay off its other two judges about 10 years ago when it faced "financial concerns" and "wanted to cut costs," Doc. 91-7 at 12, and its city charter expressly states that the judge holds office "at the pleasure of" the City Council, Doc. 106 at 13. On the other hand, Georgia

---

I don't think that the City itself, as a financially interested corporate entity, should be considered the relevant adjudicator of the cases that its municipal judge decides. While *Harper* didn't reach the question whether or when a corporate entity—as opposed to an individual employee—should be considered the adjudicator for purposes of the due-process bias analysis, I think it's relevant here (1) that Doraville has no policy or custom of influencing the outcomes of individual adjudications, *see* Maj. Op. at 10–11; *Harper*, 976 F.3d at 1244 n.10, and (2) as I'll explain, that the judge most likely isn't—and going forward, can't be considered—an at-will employee, and therefore enjoys some independence from the City's leadership, *cf. Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2198–99 (2020) (noting for-cause removal protection as a hallmark of independence). Given these facts, I think it's fair to identify the individual judge, rather than the City, as the one performing the adjudications and to conduct the due-process bias analysis by reference to the judge as an individual rather than the City.

enacted a statute in 2016 that provides municipal judges with certain removal protections: Under it, judges "shall serve for a minimum term of one year and until a successor is appointed or if the judge is removed from office" by a two-thirds vote of the municipal council—and lists as grounds for removal only "[w]illful misconduct," "[h]abitual intemperance," serious disability, and the like. Ga. Code §§ 36-32-2(a), 36-32-2.1(b)(1) (2016). Even so, the City admits that once the judge's term is over, it has no obligation to reappoint him. Doc. 91-15 at 5.

Because Doraville's judge was hired on a contract more than 20 years ago with no specified "term" and the City hasn't taken any action to modify or renew that contract, his current employment status—as the district court found—is unclear. *See* Doc. 106 at 13 n.8. Georgia's 2016 amendments to its municipal-judge statutes require that judges' terms be "memorialized in a written agreement," Ga. Code § 36-32-2(a), and the difficulty here seems to result from the fact that Doraville hasn't updated its judge's contract in light of the new law. Is Doraville's judge still serving his original term, as he seems to believe? *See* Doc. 91-7 at 13. Or has his original term ended such that he has continued working on an at-will basis, as the plaintiffs argue? *See* Appellant's Initial Br. at 6 n.1. Or is he effectively serving consecutive one-year terms that re-start on the anniversary of his first appointment, as the Georgia Municipal Association suggests? *See* Ga. Mun. Ass'n Amicus Br. at 8–9. I don't think that we can confidently answer these questions because we

don't know how Georgia law treats pre-2016 municipal-judge contracts that fail to specify the length of the judge's term.

Despite this uncertainty, I agree with the Court that, in the circumstances of this case, Doraville's judge doesn't have an unconstitutional temptation to bias as a result of his personal financial interests. That, for me, is so for two key reasons. First, both the City and the judge *believe* that the removal protections of Ga. Code § 36-32-2.1 apply and, accordingly, that the City can't fire the judge at will. *See* Appellee's Br. at 16–17, 45; Doc. 91-7 at 12–13. That shared belief, though debatable, is reasonable based on § 36-32-2.1's language, the absence of any statutory-maximum term under § 36-32-2(a), and the fact that the judge's original contract didn't limit him to any specific tenure. *See* Maj. Op. at 14–15.

Second, now that the City has represented to this Court that it can't fire the judge at will, it will likely be barred by judicial estoppel from changing its position and terminating him without good cause in the future. *See* Maj. Op. at 15. Judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment," *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quotations and citations omitted), and it "prevent[s] a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by the party in a previous pr[o]ce[e]ding," *Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1273 (11th Cir. 2010) (quoting 18 Moore's Federal Practice § 134.30 (3d ed. 2008)). We employ a two-part test to determine whether judicial estoppel applies: First,

did the party against whom estoppel is sought take an inconsistent position in an earlier proceeding—usually, but not always, under oath? *See Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1181 (11th Cir. 2017); *Smith v. Haynes & Haynes P.C.*, 940 F.3d 635, 643 n.4 (11th Cir. 2019). And second, were the inconsistent positions "calculated to make a mockery of the judicial system," rather than "the result of inadvertence or mistake"? *Slater*, 871 F.3d at 1181 (quotations omitted). Given "all the facts and circumstances of th[is] case"—in particular, the City's heavy reliance on the judge's removal protections under Ga. Code § 36-32-2.1—if the City hereafter tried to fire its judge without cause and the judge sued, judicial estoppel would likely bar the City from repudiating its earlier position that the law forbids such a termination. *Id.* at 1186.

All things considered, then, the "average man" in the judge's position wouldn't have a "possible temptation" sufficient to violate the Due Process Clause because (1) both the City and the judge reasonably believe that he can't be fired based on his decisions and (2) judicial estoppel would make it difficult—if not impossible—for the City to do so in the future. *Tumey*, 273 U.S. at 532.[2] Because

---

[2] Nor does Doraville's judge have an unconstitutional personal financial interest based on any ability that the City might have to reduce his salary, as the plaintiffs seem to suggest. *See* Appellant's Initial Br. at 26. In addition to the fact that the City hasn't changed the judge's salary in more than 20 years, *see* Doc. 106 at 12, any attempt to do so—at least during his "term"—would likely violate Georgia's municipal-judge statute, which states that municipal judges "shall receive such compensation as shall be *fixed* by the governing authority of the municipal corporation," Ga. Code § 36-32-2(a) (emphasis added).

"the probability of actual bias on the part of the judge" is not "too high to be constitutionally tolerable" *in the unique circumstances of this case*, the Court correctly denies the plaintiffs relief. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 877 (2009) (quotation omitted).

To be clear, though, in a different case, with different facts, a different result might well obtain. If, for instance, a municipal-court judge were not only dependent for his salary on a city that raised substantial revenue through court-imposed fines and fees but was also terminable at will, rather than only for cause—particularly where, as here, similarly situated colleagues had been fired and the judge's own healthcare benefits had been stripped for financial reasons in the past—there could well be a Due Process Clause violation. Even if a city doesn't explicitly pressure or direct a judge to convict, the reasonable, "average" judge in such a situation might well know that the convictions she renders meaningfully contribute to the city's bottom line and, more importantly, that the city could remove her or reduce her salary if she didn't deliver enough convictions (and thus revenue). The possibility that the city could replace the judge or cut her pay because of her low conviction rate could, in my view, create a powerful temptation for the average judge to stay in the city council's good graces by convicting more often than she otherwise would. In the doctrinal lingo, that personal financial interest could "offer a possible temptation to the average man as a judge" to be biased and thus

8                    Newsom, J., Concurring                    20-14846

violate the Due Process Clause.  *Tumey*, 273 U.S. at 532.[3]  But, again, because in the unique circumstances of this case Doraville's judge isn't confronted with the same temptation, I concur in the Court's judgment.

---

[3] The Court notes that every judge without life tenure and a guaranteed salary necessarily faces some indirect pressure from the reappointing authority.  *See* Maj. Op. at 14.  True, but the question under existing doctrine is whether the possibility of bias—which might result either from actual external pressure or the judge's own reasonable fear of employment repercussions—rises to a level sufficient to call the judge's impartiality into question.  *See Ward*, 409 U.S. at 60; *see also Caperton*, 556 U.S. at 877.  My tentative view, anyway, is that if a city not only derives a substantial portion of its revenue from municipal-court fines and fees but also reserves the right to fire its judge or cut his pay at will, then the possibility of bias is probably "too high to be constitutionally tolerable."  *Caperton*, 556 U.S. at 877 (quotation omitted).  While I (of course) don't think that life tenure is necessary to reduce the possibility of bias to "constitutionally tolerable" levels, I do think that if a city heavily relies on court-imposed fines-and-fees revenue, then its judges must have *some* structural guarantees of independence, like the for-cause removal protections that Georgia adopted in 2016.  *See* Ga. Code § 36-32-2.1.